CHRISTINA DI BRIGIDA, complainant-respondent,

*v.*

RAPHAEL DI BRIGIDA, defendant-appellant.

[Decided May 4th, 1934.]

On appeal from a decree of the court of chancery advised by Advisory Master Campbell, who filed the following opinion:

"This is a suit for support and maintenance under section 26 of the Divorce act. Abandonment is alleged to have occurred on March 5th, 1932. An answer was filed, pleading a Nevada decree of divorce. By special replication the validity of this decree is attacked on the ground of fraud.

"The parties were married June 28th, 1931, and set up a home in Hackensack where they cohabited until Monday, February 29th, 1932. During the morning of that day complainant arrived at her mother's home, accompanied by her mother, in Paterson. She was, according to her own admission, corroborated by Dr. Sutherland, pregnant.

"Defendant testified, substantially, as follows:

Two months after their marriage he implored his wife to become conceived but she refused. At each succeeding menstrual period he knew she attempted to abort herself through the medium of frequent hot baths and red pills.

"He admitted knowledge of the fact that she kept these pills in a medicine cabinet and that he made no effort to recover and destroy them. On Saturday night, February 27th, 1932, his wife complained of extreme pains in her right leg. She showed it to him. It was discolored from her hip to below her knee. Early the following morning (Sunday) complainant's mother arrived at their home.

"Some controversy ensued as to whether a doctor should be called and, if so, whom. Dr. Mader was selected by defendant. After a thorough examination of complainant Dr. Mader inquired of defendant whether he had instructed his wife to take abortive drugs. Defendant not only replied in the negative but told Dr. Mader that he desired his wife to bear a child. Dr. Mader stated he had a slight suspicion that complainant had taken medicine to bring on menstruation, thus causing the leg condition. At the hearing Dr. Mader testified that the use of abortive drugs would not have caused the painful and inflamed leg condition found on complainant but that his examination disclosed evidence of an abortion having been attempted by mechanical means. Dr. Mader had advised complainant to remain in bed four or five weeks, to which suggestion she and her mother protested. Dr. Mader thereupon suggested that complainant be removed to a hospital. To this complainant's mother rebelled, stating that she would take care of her daughter in her home at Paterson and procure the services of a physician in whom she had confidence. Defendant admitted that he did not dissent to this suggestion. (On another occasion, while driving his mother-in-law to her home in Paterson, after a visit to complainant's and defendant's home, she told him that as long as she knew anything about it her daughter would not have any children.) That night defendant slept next door at his mother's home because of lack of room in his own home, his mother-in-law remaining with the wife.

"As to the events of the following morning, Monday, February 29th, 1932, there is considerable conflicting testimony. Complainant testified that defendant drove her and her mother to her mother's home at Paterson, using for the purpose a car belonging to defendant's mother. Defendant denies this, his version being that he went to Boonton early that morning and that he so informed complainant and her mother before he left, stating that he would be right back. Upon returning to his home at about eleven A. M., he found no one there. He then drove to Paterson where he found his wife in bed in her mother's home. Both his wife and her mother told him that they had made the trip from Hackensack to Paterson by bus. Complainant's testimony to the effect that defendant drove her and her mother to the latter's home is amply corroborated. Defendant further testified that he visited his wife daily at her mother's home, these visits lasting from an hour to an hour and a half. The first two visits appear to have been in a friendly atmosphere; the remaining two or three indicate that defendant's attitude toward his wife smacked of hostility. Both his wife and her mother refused, in spite of his daily demands, to disclose to him the name of the physician who was attending his wife. On the following Friday, March 4th, 1932, he noticed a bottle of medicine on the bureau bearing the name of Dr. (William W.) Sutherland. He kept this name in mind until he left his mother-in-law's home, whereupon he made a memorandum of it. Just before noon of the next day, Saturday, he phoned Dr. Sutherland requesting an appointment for the purpose of inquiring concerning complainant's condition and the nature of her illness.

"He then went to Dr. Sutherland's office. The doctor inquired if he was separated from his wife and how much money he had because his wife and her mother desired the doctor to perform an abortive operation on complainant. To this he rebelled. From the doctor's office he went directly to his wife's bedside and informed her and her mother of his conversation with Dr. Sutherland. His wife and her mother cursed him and called him vile names, his wife reiterating

that she did not want children. Both his wife and her mother finally told him to get out of the house and stay out, that they did not want to see him again.

"On the following Friday, March 11th, 1932, defendant departed for Reno, Nevada, and has not since returned to live with or support complainant.

"Dr. Sutherland testified that on April 18th, 1933, complainant suffered a natural miscarriage, every element constituting a normal pregnancy and natural birth being present.

"According to defendant he and his wife quarreled infrequently and not seriously, over money matters, her neglect to provide home-cooked meals, her stubborn disposition and her failure to greet him with a smile. Complainant denied, as did her mother, the accusations of defendant charged against them, respectively.

"The matrimonial bond imposes upon the husband the duty to guard against and protect his wife from every evil influence and consequence; to save her from both mental and physical harm not only for herself but for himself as well, in order that they might each uninterruptedly have and enjoy the society and companionship of the other.

"Assuming, but not concluding, that complainant brought on her tardy menstrual periods by the use of red pills or other unnatural means, and that, these measures failing, she aborted herself or procured others to do so, by mechanical means, for her, as testified to by the defendant, were her acts and conduct, as well as the alleged activities of her mother in this respect, such as a reasonable husband could not see without suspicion and alarm, and take means to prevent? I think not. In *Delaney* v. *Delaney, 71 N. J. Eq. 246,* the court said, in referring to *Hedden* v. *Hedden, 21 N. J. Eq. 61:* 'If a husband sees what a reasonable man could see without alarm, or if he knows that his wife has been guilty of any weakness whereby he is put upon his guard respecting her weakness, he is called upon to exercise peculiar vigilance and care over her, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result.'

"Whether or not defendant testified truthfully is immaterial. If his testimony is true then he possessed actual knowledge of what was going on month after month over a period of months. If he perjured himself he has quite indiscreetly created a situation by which he is bound and from the consequences of which he cannot escape. He saw many things that a reasonable husband would not permit. Little, if anything, was left to his reasoning faculties. And yet he made no effort to avert the dangers he contends were, with equal monthly regularity, engulfing his wife; he admits he made not a single effort to exercise that degree of control over his wife that the marital state imposes upon him in order to prevent her, in collusion with others whose identity he knew, from committing the crimes against both nature and law he charges her with. Defendant's final opportunity in this respect occurred on Saturday, March 5th, 1933, when he went to his wife after his alleged visit to Dr. Sutherland. She was not so ill but what she could have been safely removed, under defendant's authority and direction, from her mother's home and her mother's alleged evil influence. He offered no explanation of his failure to take advantage of this situation.

"Defendant, therefore, not only contemplated but actually acquiesced in every act of complainant in her alleged attempts to abort herself or in procuring others to do so for her.

"The burden rested upon defendant to establish satisfactorily proof of his wife's alleged abortive acts. In this respect, both sides offered expert medical testimony. As is usual, irreconcilable proofs and opinions resulted. From a careful examination of the testimony, however, as well as from my observation of the general demeanor of witnesses, defendant has not convincingly overcome the burden of proof cast upon him.

"As to the decree of divorce obtained by defendant in Reno, Nevada: Defendant admits that he left for that destination on March 11th, 1932. He did not request complainant, whom he had neither seen nor communicated with for about a week, to accompany him. He has not since communi-

cated with her. He maintains that he went to Reno on the advice of his physician, Dr. Pflug, in order to seek relief, in that high altitude and dry climate, from sinusitis with which he has been afflicted since childhood and for which he had been treated eight or nine years.

"In this respect, Dr. Pflug, a sinus specialist, testified that he had operated upon defendant in 1929; that the last time he treated defendant was in February, a few days before he left for Reno and upon which occasion he advised defendant to seek a higher and dryer climate than hereabouts in order that he might obtain relief from the effects of his ailment. The first time he had seen defendant since the latter date was not until July 11th, 1933, when defendant served him with a subpœna to testify in this cause. Dr. Pflug further testified that he had not treated defendant since his return from Reno. There is no testimony to the effect that defendant was treated by any other physician for his ailment. Dr. Pflug kept no records of defendant's treatments subsequent to 1929. This is quite unusual in the modern practice of specialized surgery. I was not impressed by the sincerity of Dr. Pflug's testimony.

"Defendant was accompanied from Hackensack to the Grand Central station, in New York City, en route to Reno, by his mother, father, two sisters and a brother-in-law. He did not discuss either with these relatives or with anyone else that his purpose in going to Reno was to procure a divorce. Defendant further testified that he had been to Reno for a short time in 1926 because of sinus trouble, and had boarded with a Mrs. Toogood and Mrs. Hamilton. He claims to have told his wife about this trip after their marriage. She denied it. Defendant's relatives had the opportunity to testify in corroboration thereof but did not do so. I doubt that he made the trip and am satisfied that he so testified for the sole purpose of bolstering his defense. Upon his arrival at Reno, in the present instance, he again boarded at the establishment operated by these two women. A little over a week after his arrival in Reno he talked over his marital troubles with them. It was not until then that he made up his mind to sue for a

divorce. Mrs. Toogood thereupon introduced him to the Reno attorney who conducted his divorce proceedings.

"I find it impossible to believe that defendant concluded to institute his proceedings as the result of his conversations with these two women, virtual strangers to him, in view of his testimony to the effect that up to a week previous (four days, to be exact), when he left Grand Central station, he had not discussed the matter of divorce even with his father and mother, of whom none could be his more sincere confidants and dependable advisors.

"On April 26th, 1932, he caused to be filed a complaint for divorce, for the cause of extreme cruelty, in the second judicial district court of Nevada. He arrived in Reno March 14th. Consequently, he had been there six weeks to the day when his petition was filed.

"An exemplified copy of defendant's Nevada proceedings is on file in this court. From this it appears that the complainant was, on May 3d, 1932, served personally at her mother's home in Paterson, with a summons and certified copy of defendant's Nevada complaint, the summons being returnable within thirty days.

"On May 24th, 1932, complainant filed her bill in this cause. On the same day, on a rule to show cause, an order was entered restraining defendant *ad interim* from prosecuting his said action of divorce against the complainant herein. On May 28th, 1932, a true copy of complainant's bill of complaint and of said restraining order were served personally upon defendant in Reno. He admits that such service was made, that he understood the purport of the restraining order, that he informed his attorney of such service, that he testified at the final hearing of his complaint, and that neither he nor his attorney informed the Nevada court that he had been restrained by this court from proceeding with his divorce. His decree was entered June 4th, 1932. He returned to Hackensack from Reno by aeroplane August 7th, 1932, as the result of a telegram informing him of the illness of his father. Defendant's father had been ill intermittently for four or five years. He died several months later.

"The *subpœna ad respondendum* in this suit was served upon the defendant September 1st, 1932, but not personally.

"At the hearing defendant was called as a witness on behalf of the complainant and it was from his examination that the foregoing synopsis of testimony was adduced.

"The validity of defendant's Nevada decree depends upon his *bona fides;* whether he went to Nevada for the purpose of establishing residence *animus manendi,* or, inversely, whether his avowed intent was to evade the divorce statutes of this state and thereby perpetrate a fraud not only upon this court but upon the Nevada court as well.

"The point is well settled in this state that a recital in a decree for divorce made by the court of another state that the petitioner was a resident of that state for the statutory period is conclusive here of the truth of the fact thus recited; it is conclusive as to the period of citizenship as well as petitioner's domicile in the other state unless such determination had been procured by fraud; and that fraud is a fact that will never be presumed, but must always be convincingly proved. *Pahy* v. *Pahy, 107 N. J. Eq. 538.* To acquire a domicile, the party must have his abode in one place with the intention of remaining there, for without such intention no new domicile can be gained and the old will not be lost. All the best definitions agree in making the elements of domicile 'residence' and *'animus manendi.'*

"If the adjudication of the Nevada court on the question of defendant's domicile was rendered after all the facts bearing on the question had been fully and fairly submitted to that tribunal, it must be accepted as conclusive. If, however, defendant's decree was procured by fraud we are not precluded from inquiring whether he was not in fact a resident of this state at the time he instituted his suit for divorce in Nevada.

"The court is not bound to accept everything as true a witness may testify to. Testimony, to be worthy of belief, must not only be offered by a credible witness but must be such as the common experience and observation of reasonable men can approve as probable under the circumstances. There is no test of the truth of testimony except its con-

formity to our knowledge, observation and experience. Improbable testimony is such as imputes conduct inconsistent with those principles by which persons, similarly situated, are governed.

"There are many instances in which the testimony of the defendant, as well as those who sought to corroborate him, appears to be both improbable and inconsistent under the circumstances. As a consequence, I am satisfied that defendant went to Reno without the slightest intention of remaining there and making it his home; that the *factum* of residence and the element of *animus manendi* were dissolved in his settled determination to obtain an apparent residence there for the particular purpose of enabling him to prosecute divorce proceedings. Consequently, this court had jurisdiction over him not only when its *ad interim* restraint order was entered but still has. That this court had jurisdiction over the defendant, although the bill was the only pleading on file at the time, was settled by *Haring* v. *Kauffman, 13 N. J. Eq. 397.* In that case, as in this, the injunction was served on the defendant outside of this state. He had not yet been brought into court by appearance, process or publication. The court held, nevertheless, that the injunction was obligatory upon him. See, also, *Kempson* v. *Kempson, 63 N. J. Eq. 783,* and cases therein cited. And yet, knowing that during the whole period he sojourned in Nevada he was, nevertheless, a resident of New Jersey, he intentionally concealed from the Nevada court the fact that this court had restrained him from proceeding. This being so it is manifest that he procured the adjudication of the Nevada court on the question of his domicile by fraud.

"The Nevada decree is also void in this state for the further reason that, were defendant's allegations of extreme cruelty true, it was obtained in violation of the provisions of section 33 of the Uniform Divorce act of 1907 (*2 Comp. Stat. 1910 p. 2041*), which provides, in part, "* * * that if any inhabitant of this state shall go into another state, territory or country, in order to obtain a decree of divorce for a cause which occurred while the parties resided in this state, * * * a decree so obtained shall be of no force or effect in this state."

"In *Lister* v. *Lister, 86 N. J. Eq. 30,* Vice-Chancellor Stevenson said: 'The evidence in this case has satisfied this court that the defendant, being an inhabitant of this state, went into the State of Nevada 'in order to obtain a decree of divorce for a cause which occurred while the parties resided in this state,' * * * and the statute declares that 'a decree so obtained shall be of no force or effect in this state.' As we have seen, the proof is so absolute that the entire cause of divorce set up in this Nevada suit, and attempted to be proved therein, must have arisen while the parties were domiciled in the State of New Jersey, for the wife, the complainant herein, has never been domiciled in any other state.'

"Consequently, the validity of defendant's Nevada decree is destroyed. With this decree thus disposed of an order may be entered to the effect that on March 5th, 1932, defendant abandoned and separated himself from complainant without justification and has ever since refused and neglected to maintain and provide for her.

"In view of the fact that the proofs do not disclose the present financial condition of the defendant, a further hearing will be had for the purpose of ascertaining his faculties and determine the amount which he shall pay for the support and maintenance of the complainant, and counsel fees."

*Mr. Joseph H. Gaudielle* and *Mr. James A. Major,* for the appellant.

*Mr. Paul Rittenberg,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court of chancery by Advisory Master Campbell.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 15.

*For reversal*—None.