SHILKRET v. HELVERING, Commissioner
of Internal Revenue.

HELVERING, Commissioner of Internal
Revenue, v. SHILKRET.
Nos. 8387, 8402.

United States Court of Appeals.
District of Columbia.
Argued Oct. 13, 1943.
Decided Nov. 1, 1943.

Mr. William Cattron Rigby, of Washington, D. C., with whom Mr. Alex M. Hamburg, of New York City, was on the brief, for petitioner in No. 8387 and respondent in No. 8402.

Mr. Bernard Chertcoff, of Washington, D. C., member of the Bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Messrs. Samuel O. Clark, Jr., Assistant Attorney General, Sewall Key and Miss Helen R. Carloss, Special Assistants to the Attorney General, were on the brief, for Commissioner of Internal Revenue. Messrs. J. P. Wenchel, Chief Counsel, and Claude R. Marshall, Special Attorney, Bureau of Internal Revenue, both of Washington, D. C., also entered appearances for Commissioner of Internal Revenue.

Before GRONER, Chief Justice, and MILLER and ARNOLD, Associate Justices.

GRONER, C. J.

This case involves petitioner's income taxes for the years 1936 and 1937. The Commissioner found deficiencies to the amount of $8,701.85 for 1936 and $7,-412.01 for 1937. The Board sustained the Commissioner and this appeal followed.

The case presents two questions:

First, was petitioner domiciled in California during the taxable years so as to be entitled to report his taxable income on

a community tax basis, Poe v. Seaborn, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239; and Second, irrespective of domicile, did petitioner's earnings in California in the two taxable years constitute community income properly divisible between himself and his wife for Federal income tax purposes.

The following facts were found by the Board: Petitioner and his wife were born and were married in New York City and lived there continuously until the latter part of 1935. In that year they were living in an apartment which they leased from year to year, the then existing lease expiring September 30, 1936. On October 31, 1935, petitioner entered into an exclusive personal service contract with RKO Studios, Incorporated, located in Hollywood, California, running for two years with an option of renewal to RKO for an additional year. Petitioner left New York for California about November 14, 1935. His wife stayed at home until February, 1936, when she joined him in California. On August 10, 1936, while in California, she signed a new lease on the New York apartment running from August 31, 1936, to September 30, 1937, at the annual rental of $3,000. Subsequently she renewed the lease for still another year. Petitioner guaranteed payment of the rent. After petitioner's arrival alone in California he lived in a hotel or a furnished apartment some three or four months until the arrival of his wife. Thereafter they lived for awhile in furnished apartments and subsequently for a year and a quarter in a furnished house.

Under the contract with RKO petitioner was to be paid a salary of $1,000 a week for the first year and $1,100 a week for the second year, and RKO agreed in addition to pay his transportation from New York to Hollywood, together with the transportation charges on petitioner's musical library and to provide space for it in RKO Studios. RKO also agreed to furnish petitioner return transportation to New York City and to pay the cost of bringing back his library in the event it failed to exercise its option—on condition that petitioner should within two weeks after the two-year period leave Hollywood and return to New York.

Petitioner is a well-known musician, composer and director. Until 1935 his professional work was in and near New York City. For a long time he was Musical Director of the Victor Talking Machine Company. Around 1924 he began radio work which he has continued up to the present time. In 1929 he began the work of synchronizing for motion pictures. A few years later he formed the opinion that the competition of the radio industry with the recording field tended to diminish the business prospects of the latter and that the public was transferring its interest from the recording of music to the production of music by the radio.[1] He became interested in sound reproduction in the motion picture industry and in the technique involved in making the scores for music for motion pictures. He believed that this and the expansion in the field of television would become a new business in which he could use his experience and talent. Accordingly he went to Hollywood in April of 1935, where he met various people in the motion picture industry and received in September of 1935 the offer from RKO, which he subsequently accepted.

Just before he left New York City he disbanded two orchestras which he had organized and went to Hollywood, as he says, in the hope that he would remain there to work in the motion picture industry. He closed one of his New York bank accounts and ordered his life insurance premium notices addressed to him in Hollywood. He also removed his personal securities from New York to California. At its expiration, he renewed the insurance policy on his library with a Los Angeles agency. He joined the Hillcrest Country Club and the Musicians' Union in California and sent his son to the Law School of the University of Southern California.

The option reserved to RKO was not exercised and in anticipation that it would not be, petitioner, some six months in advance of the contract expiration, had negotiations with Metro-Goldwyn-Mayer with a view to obtaining a contract with them. These negotiations failing, in March, 1938, petitioner, with his musical library, returned to New York.

---

[1] When one considers the horrisonant sounds that now too often offend the radio listener's ear in contrast with the exquisite symphonies of the great masters, or the superb voices of Caruso, Galli-Curci and other great artists which the recording art has perpetuated, it may be questioned if petitioner's vision was prophetic.

Neither petitioner nor his wife at any time changed their voting registration from New York to California, and both voted in New York City in the 1938 fall elections. While in California each filed California State income tax returns for 1936 and 1937 as "residents" of that State. During 1936 petitioner received interest on bank deposits in five New York banks and interest on New York mortgages. In 1937 he received interest on deposits in one New York bank and in one California bank. Petitioner's contributions during the period in question, as well as those made by his wife, were chiefly to New York charities. In 1936 petitioner took deductions in his Federal return for rent for three New York offices in the aggregate amount of $3,839.16, and in 1937 took a deduction of $483.33 as office rent in New York for that year, stating that he had used one room in his New York apartment in lieu of the offices he had previously kept in that City. Petitioner explained the renewals of the New York apartment lease covering the whole period of his sojourn in California as due to the fact that the apartment contained his furniture and to have cancelled the lease would have obliged the return of his wife to New York to pack and store the furniture, which she was unwilling or too unwell to undertake, but that he personally was opposed to a renewal and gave in only as a result of his wife's desires on the subject.

Petitioner's contention before the Commissioner, the Board and this Court is that he was domiciled in California in the years 1936 and 1937 (or, in the words of the Board's opinion, "He asserts that all of his acts, his state of mind, and his then intentions about the present and the future, were such that he acquired a new domicile.") As a result of this he insists he was entitled to divide with his wife, as he did, his net income derived from his salary from RKO. Acting on this theory each filed a Federal income tax return on the basis of the California community statutes.

 The Commissioner argues that in deciding the case we are bound by the substantial evidence rule and that it is not our function to weigh the evidence or to choose between conflicting inferences. On the ground that there is substantial evidence to support the findings, he says our duty is to affirm without more. But we think that rule has no applicability here. Domicile, we recently said[2], is a compound of fact and law, and where, upon admitted or undisputed facts, the decision turns on controverted legal principles, it is reviewable. Here there is no dispute as to the essential facts, the conflict relates only to their legal effect. The question must be determined by the application of certain rules long established by the courts, State and Federal, to find where a man's home really is, and there is no dearth of authority on the subject. In one of our most recent pronouncements in this respect[3], we said that to effect a change from an old and established domicile to a new one, there must be the absence of any present intention of not residing in the latter permanently or indefinitely. Or, stated differently, there must be a fixed purpose to remain in the new location permanently or indefinitely. For a domicile once acquired is presumed to continue until it is shown to have been changed, and to show the change two things are indispensable,— "First, residence in the new locality; and, second, the intention to remain there. The change cannot be made except facto et animo. Both are alike necessary. Either without the other is insufficient. Mere absence from a fixed home, however long continued, cannot work the change. There must be the animus to change the prior domicile for another. Until the new one is acquired, the old one remains. These principles are axiomatic in the law upon the subject."

This is the language of the Supreme Court in Mitchell v. United States, 21 Wall. 350, 352, 22 L.Ed. 584. See to the same effect Gilbert v. David, 235 U. S. 561, 569, 35 S.Ct. 164, 59 L.Ed. 360, and the cases cited in the footnote below[4].

---

[2] Sweeney v. District of Columbia, 72 App.D.C. 30, 113 F.2d 25, 129 A.L.R. 1370.

[3] Beedy v. District of Columbia, 75 U.S. App.D.C. 289, 126 F.2d 647.

[4] Williamson v. Osenton, 232 U.S. 619, 624, 34 S.Ct. 442, 58 L.Ed. 758; Anderson v. Watt, 138 U.S. 694, 707, 11 S.Ct. 449, 34 L.Ed. 1078; Appeal of Carey, 75 Pa. 201, 205; Price v. Price, 156 Pa. 617, 626, 27 A. 291; Hayes v. Hayes, 74 Ill. 312, 316; Bangs v. Inhabitants of Brewster, 111 Mass. 382, 385; Lindsay v. Murphy, 76 Va. 428, 430; Hairston v. Hairston, 27 Miss. 704, 717, 61 Am.Dec. 530; City of Hartford v. Champion, 58 Conn.

Appellant cites language from District of Columbia v. Murphy, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329, which, when considered out of its context, might indicate a change in the established rule. But in that case the Supreme Court was construing a revenue statute applicable only to the District, and the expressed purpose of the court was to ascertain the intent of Congress in enacting the law. To accomplish this the ruling of the court went no farther than to change the former rule of burden of proof, holding it is not unreasonable to require a person "domiciled" in the District of Columbia to prove his intention to retain his original domicile in order to escape the District tax imposed by the law (314 U.S. at pages 455, 456, 62 S.Ct. at page 310, 86 L.Ed. 329). Local conditions, peculiar to the District of Columbia, were the controlling factors.

Applying then the definitions of the cases to the undisputed facts we have here, we find a situation in which petitioner, in contracting for his personal services outside of his home State, insisted on and obtained a provision in the contract for the payment of his own transportation and the transportation of his movable property back to his home at the conclusion of his contract term of service; a retention of an office in New York during the whole of the two year period; the retention at a cost to him of $6,000 of the lease on the apartment in which he had lived in New York, and to which he ultimately returned. During the period of his absence he retained his voting rights in New York, though there is no evidence that he exercised them in that period, but the fact is that on his return in 1938 he did vote in New York, which under her laws he could not lawfully have done if, in fact, he had given up his legal residence from the time of his departure to the time of his return. We think we may safely assume that petitioner knew of this law when he voted in New York in 1938, and that he would not have exercised the right of suffrage if he had not then considered himself to have been always a citizen of New York. There is a total absence in the evidence of any statement made by him to anybody, either in New York or California, of a purpose to make

his home permanently or for an indefinite time in the latter State. Anything he appears to have done in establishing for himself a permanent residence in California was at least equivocal in character. As against all of this is petitioner's precise statement to the Board that he did entertain at all times the purpose of abandoning his home in New York in favor of a new home in California; and this statement of course is entitled to weight, but when considered with the things which admittedly occurred, and which point to an opposite purpose, we are impelled, reluctantly, to the conclusion the intention was too nebulous—or, as it is sometimes called, too "floating"—to outweigh convincing acts to which we have referred. No importance, we think, is to be attached to the fact that petitioner filed State income tax returns as a "resident" during his sojourn in California. For these, in the circumstances, were required under the California law[5]. Nor do we think petitioner's reasons for the two yearly renewals of the lease of his New York apartment, though now honestly declared, ought to be accepted as reflecting his state of mind as of the time the renewals were made. As to his then motives, the unavoidable inferences from the actual facts speak for themselves. The natural thing, in the case of a person moving for all future time from New York to California, would have been to abandon the lease and move the furniture to the place of the new home, even if it were necessary to store it temporarily while he sought a residence there. To pay out $6,000 for two years' storage in the place abandoned, when the same result, with greater convenience to himself, might have been attained for perhaps one-sixth that amount in the new place, is so contrary to common experience as to require more than the simple explanation which is given. And this appears even more so when it is remembered that both he and his wife went back to New York in the Christmas seasons in both 1936 and 1937. From all of this we conclude that petitioner, whatever his honest view—in retrospect—may be, never in fact or in law abandoned his established domicile in New York, nor established a new one in California.

268, 20 A. 471; Cadwalader v. Howell, 18 N.J.L. 138, 144; Hegeman v. Fox, 31 Barb., N. Y., 475, 476; Town of Albion v. Village of Maple Lake, 71 Minn. 503, 74 N.

W. 282; Di Brigida v. Di Brigida, 116 N. J.Eq. 208, 172 A. 505.

5 Cal.Stat. (1935) p. 1090, § 2(k); Cal. Stat. (1937), p. 1831, § 2(k).

Second. Nor do we think that petitioner was entitled to apply the community property laws of California to income derived from his services while temporarily located there. As to this, we think it is reasonably clear that the California community property law does not apply, as to Federal income tax returns, to the earnings of non-domiciliaries. While we have been referred to no California case that rules upon the precise question, the cases from that State indicate that the California rule—in the absence of an applicable statute—would follow that of other community states in which the question, under more or less similar circumstances, has arisen. See Kraemer v. Kraemer, 52 Cal. 302; In re Estate of Thornton, 1 Cal. 2d 1, 33 P.2d 1, 92 A.L.R. 1343; In re Estate of Allshouse, 13 Cal.2d 691, 696, 91 P.2d 887, 890.

In most of the cases we have examined the place in which the money is earned and the place of domicile are the same, in consequence of which no question of the law of domicile was involved; but where the place of acquisition and the domicile are different, certainly the majority of cases apply the common-law rule of domicile. The question is not new and was much debated, especially in the preparation of the Restatement. In the early stages of the Institute discussion the situs view was recommended, doubtless under the influence of some State statutes on the subject, but ultimately the domiciliary rule was substituted and appears now as Section 290 of the Restatement (Conflict of Laws), as follows: "Interests of one spouse in movables acquired by the other during the marriage are determined by the law of the domicile of the parties when the movables are acquired."

And the latest decision, somewhat in point, which we have found is the case of Commissioner v. King, 5 Cir., 69 F.2d 639, 640. In that case a Texas lawyer undertook a litigation on a contingency contract. He ultimately won the case, but prior to the payment of his fee his wife died. The question then was whether under the Texas community law—where the parties were domiciled—the wife's estate was entitled to half the fee received, and it was held that it was. The applicable part of the opinion on the subject at hand is:

"The petitioner challenges the holding of the Board of Tax Appeals that the above-mentioned fee when it was received was community property and belonged one-half to the respondent and one-half to the estate of his deceased wife, and contends that the amount of that fee was separate property of the respondent. The question so presented is governed by the law of Texas, the state in which the respondent and his deceased wife resided."

The same conclusion was reached by the Board of Tax Appeals in the case of De Vaux v. Commissioner, 14 B.T.A. 205, 206. There a citizen of a community law State earned salary from a corporation located in a non-community law State for services rendered in that State, and it was held that the earnings so received were community property, as to which the wife was entitled to half, the Board saying it is elementary that the law governing personal property is the law of the domicile.

The rule in the Restatement is approved by numerous text writers, including Goodrich, Conflict of Laws (2d Ed. 1938), 121; Beale, The Conflict of Laws, Sec. 290.1; and the authorities are enumerated and cited in an article on the subject in 21 Cal. Law Review, 221, 230, and in 11 Washington Law Review, 120, 212, 215. This conclusion, supported as we think it is by the weight of authority, seems to us to be manifestly the logical result. For as was said by Chancellor Kent[6]: "It is a settled principle of international jurisprudence, and one founded on a comprehensive and enlightened sense of public policy and convenience, that the disposition, succession to and distribution of personal property, wherever situated, is governed by the law of the country of the owner's * * * domicile * * * and not by the conflicting laws of the various places where the goods happened to be situated."

It would be a confusing situation if a Washington lawyer employed to handle a litigation in California, which required his presence in that State for a year or even longer,—as is by no means uncommon nowadays—were to find upon the payment of his fee and his return to Washington that it was subject to the community property laws of California. But see generally on the subject: Birmingham W. W. Co. v. Hume, 121 Ala. 168, 25 So. 806, 77 Am.

[6] 2 Kent Com., 429.

St.Rep. 43; Jones v. Ætna Ins. Co., 14 Conn. 501; Leech v. Guild, 15 La.Ann. 349; In re Matter of Majot's Estate, 199 N.Y. 29, 92 N.E. 402, 29 L.R.A.,N.S., 780; McLean v. Hardin, 3 Jones' Eq., N.C., 294, 69 Am.Dec. 740; Pearl v. Hansborough, 9 Humph. 426, 433; Hill v. Townsend, 24 Tex. 575; Myers v. Vayette, 146 Wash. 1, 261 P. 647; Lyon v. Knott, 26 Miss. 548; Davis v. Zimmerman, 67 Pa. 70; Black v. Commissioner, 9 Cir., 114 F.2d 355, 359; Snyder v. Stringer, 116 Wash. 131, 198 P. 733; Noble v. Commissioner, 10 Cir., 138 F.2d 444, decided October 22, 1943.

Affirmed.

In the case of Mrs. Shilkret—No. 8402— the Board, upon a reexamination of her returns for 1936 and 1937, found overpayments.

Reimbursements in the appropriate amounts were ordered accordingly.

This was correct and the Board's order is affirmed.

Affirmed.