**PENN MUT. LIFE INS. CO. v. FIELDS
et al.**
No. 7854.

United States District Court
S. D. California, Central Division.

Nov. 1, 1948.

Supplemental Opinion Nov. 24, 1948.

O'Melveny & Myers, L. M. Wright and Franklin T. Hamilton, all of Los Angeles, Cal., for complainant.

John W. Preston, Sr. and John W. Preston, Jr., both of Los Angeles, Cal., for defendants Walter Fields and Adel C. Smith.

Mark Herron, Ernest A. Tolin and G. Allen Bisbee, all of Los Angeles, Cal., for defendant Harriet V. Fields.

YANKWICH, District Judge.

I. The Factual Situation in the Case

W. C. Fields, the well-known actor, died in Los Angeles County, California, on De-

cember 25, 1946. Surviving him are his widow, Harriet V. Fields, to whom he was married at San Francisco, in 1900, and a son, W. Claude Fields, born in 1903. At the time of his death, the marriage had not been dissolved, although the parties had not lived together, as husband and wife, since 1907. The mother and son lived at various times in New York and California prior to July 7, 1936. Since that time, they have made California their permanent home. Over this course of years, the wife received for her maintenance and the support and maintenance of their son during minority, small amounts of money which ranged from $30.00 to $75.00 a week. This was not the result of any agreement for separation or maintenance, for the widow denied that there was any separation with her consent. She insisted, at the trial, that she lived separate and apart from her husband because he had abandoned her, that the subsistence she received was not the result of any agreement, but that,—to use her own language,—"she took whatever he gave her", that the highest amount was for a period of three years when she received $75.00 a week. At the time of his death, she was receiving $40.00 a week.

Walter Fields is the brother of W. C. Fields, Adel C. Smith is his sister. On March 8, 1934, W. C. Fields paid to the Penn Mutual Life Insurance Company, complainant, the sum of $26,500.00 in consideration of which sum the company issued a contract of insurance in the nature of an annuity designated and bearing No. 1817373. The death benefit was made payable to Walter Fields and Adel C. Smith, brother and sister of W. C. Fields, share and share alike, or to the survivor. After the death of W. C. Fields on December 25, 1946, and the submission by the beneficiaries of proof of death as required by the contract of insurance, the company paid one-half of the proceeds of the insurance,—namely, the sum of $12,729.42, to the two

designated beneficiaries in equal shares,—to-wit, in the sum of $6,364.71 each. The beneficiaries having made claim to the entire sum, the insurance company instituted this action in interpleader on December 15, 1947, making the beneficiaries and the surviving widow parties and asking that they be required to appear and set forth their conflicting claims to the unpaid portion of the policy, which, at the time of the trial, amounted to the sum of $12,888.32. The beneficiaries, Walter Fields and Adel C. Smith, by their Answer and Counterclaim, lay claim to the entire sum. The surviving widow, Harriet V. Fields, in her Answer, claims the money as hers under the community property laws of California. She repudiates the gift as one made without her knowledge or consent, with moneys derived from the earnings of W. C. Fields at the time when he was a resident of California.

II. Community Property and Domicile

(A) *Gifts of Community Property under California Law.*

The marriage status of W. C. Fields and Harriet V. Fields is undisputed. So is its continued existence from its inception in 1900 to the time of his death. It is not (indeed, it cannot) be denied that if, on March 8, 1934, W. C. Fields was domiciled in California, he could not, without the wife's consent, use the moneys of the community derived from his earnings to purchase the annuity policy for his brother and sister. For the interest of the wife in one-half of the community property is a *definite estate,* whether we call it vested or not. And, while the husband has the management of the property, he cannot make a gift of it without her consent. If he does, she may, after his death, make claim to her half of it.[1]

(B) *The Law of Domicile.*

The controversy centers solely around the question of W. C. Fields' legal

---

[1] California Civil Code, Sections 161a, 162, 163, 164, 172. See my opinions in Re Freitas, D.C.Cal.1936, 16 F.Supp. 557; Bank of America National Trust & Savings Ass'n v. Rogan, D.C.Cal.1940, 33 F. Supp. 183. And see, Stewart v. Stewart, 1926, 199 Cal. 318, 249 P. 197; Spanfelner v. Meyer, 1942, 51 Cal.App.2d 390, 124 P.2d 862; Horst v. Commissioner, 9 Cir., 1945, 150 F.2d 1; In re Estate of McNutt, 1940, 36 Cal.App.2d 542, 552, 553, 98 P.2d 253; Grimm v. Grimm, 1945, 26 Cal.2d 173, 157 P.2d 841; Cooke v. Cooke, 1944, 65 Cal.App.2d 260, 150 P.2d 514. And see cases in Note 15.

domicile on the day on which the policy was issued.[2] . The words "residence" and "domicile" have been the source of much confusion. This has arisen because of the different meanings which attach to them when used in dissimilar situations. Domicile has been defined (in the oft quoted statement of Story's) as the place where a person "has his true, fixed, permanent home and principal establishment and to which, whenever he is absent, he has the intention of returning (animus reventendi.)" [3]

One judicial wit has described a man's domicile as the place where "he might be expected to be when he was not in some other place." Vattel's definition of domicile as "a fixed residence with the intention of always staying there" is too narrow. The definition more suited to modern conditions is that place in which a person has fixed his habitation without any *present* intention of removing from it. Domicile implies more than mere residence. Residence and intention to remain must concur. As it is sometimes expressed, the factum (presence) and animus (intention) must coexist.

In the statutes of California dealing with marriage and divorce, the words "domicile" and "residence" are used synonymously. However, as a rule, whenever "residence" is mentioned, it is evident that a residence which has risen to the dignity of "domicile" is meant.[4] When it is said, for instance, in Rule 2 laid down by Section 52 of the Political Code that "there can only be one residence", it is apparent that domicile is meant. For this is a rule of domicile. A person can have *only one* domicile, no matter how many residences he may have.[5]

To effect a change of domicile, the animus or intention is as essential as the act of residence. A mere change of place of abode, however long continued, is insufficient, unless the proper animus or intention is present. This, because, as stated by Mr. Justice Stone in State of Texas v. State of Florida: "Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile." [6]

For this reason, "the place where a man lives is properly taken to be his domicile until facts adduced establish the contrary." [7] And, while to establish such in-

[2] At the trial no question was raised as to what the rights of the widow would be under the law of New Jersey, if that was the decedent's domicile. At my suggestion, the question was briefed by counsel. I am convinced that, *absent actual fraud*, a gift of the character here involved, could be made, under the common law by a husband legally domiciled in a common law state. See, 41 C.J.S., Husband and Wife, §§ 18, 19, 20; Holzbeierlein v. Holzbeierlein, 1937, 67 App. D.C. 219, 91 F.2d 250, 252. The conclusion reached on the question of domicile makes a detailed discussion of this phase of the law as declared in the decisions of the courts of New Jersey, unnecessary.

[3] Story, Conflict of Laws, 8th ed., 1883, Sec. 41.

[4] California Civil Code, Secs. 128, 130; California Political Code, Secs. 52, 1239.

[5] The foregoing summary taken from a decision rendered by me on June 6, 1928, while a Judge of the Superior Court of California, which was affirmed on appeal (Warren v. Warren, 1932, 127 Cal.App. 231, 15 P.2d 556), states correctly the law today. See, Restate-

ment, Conflict of Laws, Secs. 9-24; 9 R.C.L., Sec. 538; Note, Ann.Cas.1917B, 727; 17 Am.Jur., Domicil, Secs. 2, 4, 9; 28 C.J.S., Domicile, §§ 2, 3, 11; California Political Code, Secs. 52, 1239; California Elections Code, Secs. 5652, 5660, 5661. See also, Chambers v. Hathaway, 1921, 187 Cal. 104, 200 P. 931; Younger v. Spreckels, 1909, 12 Cal.App. 175, 106 P. 895; Shilkret v. Helvering, 1943, 78 U.S.App.D.C. 178, 138 F.2d 925; Butler v. District of Columbia, 1946, 80 U.S.App.D.C. 310, 153 F.2d 617. And see, Yankwich, Marriage and Divorce, 1937, p. 44.

[6] State of Texas v. State of Florida, 1939, 306 U.S. 398, 424, 59 S.Ct. 563, 576, 830, 83 L.Ed. 817, 121 A.L.R. 1179. And see, Mitchell v. United States, 1874, 21 Wall. 350, 353, 22 L.Ed. 584 (*the leading Supreme Court case on the subject*); Gilbert v. David, 1914, 235 U.S. 561, 569, 35 S.Ct. 164, 59 L.Ed. 360; In re Estate of Weed, 1898, 120 Cal. 634, 53 P. 30; In re Estate of Peters, 1932, 124 Cal.App. 75, 77, 12 P.2d 118.

[7] District of Columbia v. Murphy, 1941, 314 U.S. 441, 455, 62 S.Ct. 303, 309, 86 L.Ed. 329.

tent, the acts and declarations of a person may be considered [8], a mere "floating intention to return at some future period" to a former place of abode is not enough to overcome residence in fact,—especially if it has continued for a long period of time.[9]

### III. Residence or Domicile

We test the facts in the case by these principles.

It is the contention of the named beneficiaries that W. C. Fields was domiciled in New Jersey at the time the annuity policy was purchased and that such domicile continued until 1937. Walter Fields testified that, during the lifetime of their mother, W. C. Fields claimed Philadelphia, where she resided, as his home. After her death in 1925, W. C. Fields told him that he wished to make his permanent home with him at Waterford Works, New Jersey in the house built by Walter Fields in 1919, and occupied by him ever since. A room was set aside in this house for W. C. Fields and his clothes and some boxed books were moved into it. Occasionally, when he played in nearby towns, he would occupy this room on week-end visits or between shows. W. C. Fields came to California in 1931. The brother testified that about 1937, in a letter which has been lost, he disclosed to him, for the first time, his intention to remain in California, by writing that (in the brother's paraphrase of the language) "It is the nearest place to Heaven that he had ever seen". His clothes were sent to him in California in 1937, and later, in 1938, two boxes of books were sent, freight receipts for which were produced. The sister, Adel C. Smith, testified to W. C. Fields' expressed desire to make his brother's home his residence, after the mother's death, and to the sending of the clothes and books in 1938. His secretary heard no expression of intention to change the permanent legal residence until 1938, his agent not until 1939. The accountants who pre-

pared the income tax returns were instructed to give New Jersey as the legal residence for the 1931 return. These instructions were not changed until 1937.

From the time of his arrival in California, W. C. Fields was employed by various motion picture companies, receiving high remuneration for his services. During the year 1934, his average weekly compensation was $5000.00 He occupied various rented homes in Los Angeles County, and never, after his arrival, in California, returned to occupy the room in the brother's home at Waterford Works, New Jersey.

The evidence in the record shows that, up to 1937, in his income tax returns, that city was claimed as his residence, and those who prepared them testified that the information was originally secured from him and, later on, inserted in subsequent returns, until directed to make the change in 1937.

So, in assaying the facts, we are confronted with this inescapable situation: That, from his arrival in California in 1931, W. C. Fields was employed here, and resided in homes in Los Angeles County, from which he also conducted his business. These homes were occupied under rental or lease arrangements of various durations. We have proof of the leasing of a pretentious, furnished home on September 2, 1931, for the period of one year and of its occupancy for the duration of the lease and six months over. We also have testimony of negotiations in 1933 with a real estate agent for the purchase of unimproved residential property and the expressed desire of W. C. Fields to build a home thereon for himself. On May 17, 1932, he wrote to the Central Hanover Bank of New York City requesting the transfer of the contents of his safety deposit box to California, the letter reading: "Enclosed please find key to my Safe Deposit Box 131. Will you kindly seal the contents of the box in an

---

[8] Whitlow v. Durst, 1942, 20 Cal.2d 523, 525, 127 P.2d 530; Johnston v. Benton, 1925, 73 Cal.App. 565, 569, 239 P. 60.

[9] Gilbert v. David, 1914, 235 U.S. 561, 569, 35 S.Ct. 164, 167, 59 L.Ed. 360; State of Texas v. State of Florida, 1939, 306 U.S. 398, 425, 59 S.Ct. 563, 830,

83 L.Ed. 817, 121 A.L.R. 1179; and see In re Estate of Weed, 1898, 120 Cal. 634, 639, 53 P. 30; Bullis v. Staniford, 1918, 178 Cal. 40, 46, 171 P. 1064. On the evidentiary factors to be considered in determining domicile, see Note, 61 Harvard Law Rev., 1948, pp. 1232–1240.

envelope and send it to me registered mail or American Express. *I will discontinue the use of the box as I am almost permanently settled here in California.* Thanking you in advance. If there are any charges, you may send the package C.O.D. Yours very truly, W. D. Dukenfield." (Emphasis added.)

A bank account was established in Los Angeles and maintained throughout the period 1931–1937, into which were deposited the earnings received during the period, although some smaller amounts were kept in banks outside the State. He severed his connection with a New York Club and acquired membership in local clubs, such as the Automobile Club of Southern California, The Masquers (*in which he held a resident membership from 1931 to 1937),* and the Screen Actors' Guild. His resignation from the New York Athletic Club is very revealing. Under date of June 4, 1933, he wrote: "Will you please accept my resignation and send me a bill for my indebtedness to date. *My reason for resigning is that I have taken up my residence in California and intend to remain here.* Yours very truly, W. C. Fields." (Emphasis added.)

In 1933, he voted in North Hollywood, in the office of the real estate broker Michael A. Vargo, who had negotiated for him the lease already referred to and with whom he had discussed purchases of property, at an election held some time in the summer of that year. Proof of the voting is supplied by one of the election officials who has been a member of the local Election Board since 1930. This is confirmed by Vargo, who produced an autograph book in which W. C. Fields wrote "Mike Andrews, my friend. Best wishes always, Bill Fields". While it bore no date, it followed, in the autograph book, 6, 1933. The witness Vargo stated positively that the autograph was affixed on election day. As no one may vote in California without registering, after acquiring a legal domicile, and, as the presumption of legality attaches to the act of every person, it must be assumed that W. C. Fields complied with the law and registered as a condition precedent to voting. As the officials in charge of such records under the law, destroy them periodically, no records prior to 1938 were available at the trial. But the facts just alluded to prove registration. This, under California law, implies an intention to reside permanently.[10]

More, on December 1, 1934, W. C. Fields made the claim that he was a registered voter to a deputy sheriff, who took his statement and acknowledgment to an application for appointment as a deputy sheriff of Los Angeles County. He gave North Hollywood as his permanent residence.

In a petition, sworn to on August 22, 1939, filed before the United States Board of Tax Appeals, involving taxes for the years 1933, 1934, 1935 and 1936, and asking a re-examination of a deficiency assessed on June 10, 1939, W. C. Fields claimed domicile in California for the years 1933 and 1934. His sworn statement read: "During the period involved in this appeal, *petitioner was domiciled in California, but maintained as a permanent mail address, 'R.F.D. #1, Waterford Works, New Jersey'. During the 1933 and until October, 1934, he rented a home located at 9950 Toluca Lake Avenue, North Hollywood, California, which was used both as an office and a residence. In October, 1934, he rented a house at 4704 White Oaks Avenue, Encino, California, which, likewise, was used during the ensuing two years both as an office and a residence.* During this entire period and for many years prior thereto, he was separated from and not living with his wife, Hattie Fields." (Emphasis added.)

This verified statement is not a casual claim of domicile, but one buttressed with facts showing occupancy of premises in California, for residential and business purposes, under long leaseholds, with an explanatory reference to the separation from Harriet V. Fields. The abandonment of the defense based on such claim does not wipe out its assertion as an admission

---

10 "When residence is spoken of in connection with the right of a person to vote, 'legal residence' is meant." Huston v. Anderson, 1904, 145 Cal. 320, 328, 78 P. 626, 635; And see, People v. City of Long Beach, 1909, 155 Cal. 604, 605, 607, 102 P. 664; People v. English, 1921, 54 Cal.App. 90, 97, 201 P. 145.

against the present contention made on behalf of the decedent.[11]

## IV. Floating Intentions

In sum, against the fact of residence and declarations of permanency of the type just referred to, we have merely the claim in the tax returns and the unexecuted intention expressed to his brother, sister, secretary and agent, of returning *some time* to this one-room residence in New Jersey, made at times when all his professional and other activities implying permanency were carried on in California. Such unexecuted intentions cannot overcome the force of facts of this character. For they are of the type which the Supreme Court rejected in *State of Texas* v. *State of Florida,* supra, already adverted to. The following language is singularly appropriate to the situation which confronts us here:

*"Residence in fact, coupled with the purpose to make the place or residence one's home, are the essential elements of domicile. * * * We conclude, as the Special Master found, that Green ceased to have a place of residence in Texas after 1911. About 1914 he gave up his nominal place of abode in the room which he had rented in Terrell, Texas, and which in fact he had never occupied. After that he was never identified in fact with any place of residence in Texas, and there was nothing in his life to connect him with a Texas home other than his frequent statements that his legal residence was in Texas. While one's statements may supply evidence of the intention requisite to establish domicile at a given place of residence, they cannot supply the fact of residence there;* Matter of Newcomb, supra [192 N.Y. 238], page 250, 84 N.E. 950; Matter of Trowbridge['s Estate], 266 N.Y. 283, 292, 194 N.E. 756; *and they are of slight weight when they conflict with the fact.* Feehan v. Tax Com'r, 237 Mass. 169, 171, 129 N.E. 292; [In re] Dorrance's Estate, 309 Pa. 151, 163 A. 303. This is the

more so where, as here, *decedent's declarations are shown to have been inspired by the desire to establish a nominal residence for tax purposes, different from his actual residence in fact.* Thayer v. [City of] Boston, 124 Mass. 132, 26 Am.Rep. 650; Feehan v. Tax Com'r, supra; Matter of Trowbridge, supra; Beale, supra, § 41C. *In such circumstances the actual fact as to the place of residence and decedent's real attitude and intention with respect to it as disclosed by his entire course of conduct are the controlling factors in ascertaining his* domicile. Thayer v. [City of] Boston, supra. *When one intends the facts to which the law attaches consequences, he must abide the consequences* whether intended or not. National City Bank of New York v. Hotchkiss, 231 U.S. 50, 56, 34 S.Ct. 20, 21, 58 L.Ed. 115; Dickinson v. Brookline, 181 Mass. 195, 196, 63 N.E. 331, 92 Am.St.Rep. 407.

*"Whatever floating intention Green may have had after 1911 to return to Texas and to make his home there, it is plain that it receded into the background after his mother's death and had completely vanished when he began to build up his extensive estate at Round Hills in Massachusetts. When he had established himself there all the circumstances of his life indicated that his real attitude and intention with respect to his residence there were to make it his principal home or abiding place to the exclusion of others. * * * His conception of legal residence or domicile as a mental state whereby he could obtain certain political advantages and freedom from taxation does not weigh against this conclusion.* He could not elect to make his home in one place in point of interest and attachment and for the general purposes of life, and in another, where he in fact had no residence, for the purpose of taxation." [12] (Emphasis added.)

So here, the actualities should prevail over wishful longings, however impelled.

When to the commanding occurrences adverted to, we add the fact that the claim

---

[11] 20 Am.Jur., Evidence, Secs. 630, 644; 31 C.J.S., Evidence, §§ 299, 303; White v. Mechanics' Securities Corporation, 1925, 269 U.S. 283, 301–302, 46 S.Ct. 116, 70 L.Ed. 275; Rogers v. Edward L. Burton & Co., 10 Cir., 1943,

137 F.2d 284, 286, and cases cited in Note 6.

[12] State of Texas v. State of Florida, 1939, 306 U.S. 398, 424, 59 S.Ct. 563, 576, 830, 83 L.Ed. 817, 121 A.L.R. 1179.

of New Jersey residence may have been motivated by a desire to protect his largess, evidenced not only by the present gift, but by others made of the community property, against any attack by the wife, the declarations of intention to return to New Jersey and the designation of that state as his residence for tax purposes lose all significance.

"* * * *if the intent was doubtful or inconsistent with the legal effect of dominant facts, it must fail.* For instance, apart from possible exceptions, a man cannot retain a domicil in one place when he has moved to another, and intends to reside there for the rest of his life, *by any wish, declaration, or intent inconsistent with the dominant facts of where he actually lives and what he actually means to do.*" [13] (Emphasis added.)

Other facts might be alluded to from which an intention to remain permanently in California can be traced to a date late in 1932, which would be subsequent to the letter of May 17, 1932, in which he wrote: "I am *almost permanently settled here in California,*" and would precede his letter of resignation to the New York Club dated June 4, 1933, in which he stated as a *fait accompli* "I have taken up my residence in California and intend to remain here."

This conclusion is consistent with his assertion in the petition before the Board of Tax Appeals in which California domicile is alleged for a four-year period beginning 1933. The years 1931, 1932, and 1933 may well be considered as a period of readjustment for a new arrival in the State. So considered, the pattern has a consistency which cannot be disregarded. It shows permanent ties,—*professional, business, social, and civic,*— which are consistent *only* with California domicile. They spell permanency. They outweigh the mere

expressed but unexecuted intention of future return to a transcient abode in New Jersey.

The words of the court in *Warren v. Warren* are apposite: "True, the defendant testified that she went to Reno for the purpose of making Nevada her home. In view of the circumstances, however, *the trial court was under no obligation to accept such a statement.* The defendant's statement of her intent to make Nevada her home is well answered by a note appended to the case of Rex v. Board of Assessors, found in Ann.Cas.1917B, page 728, as follows: '*Evidence of expressed intent, however, has no controlling weight if such an intent is inconsistent with the acts and general conduct of the person. Acts showing intent will, in such a case, outweigh expressions of intent.*' Citing a number of cases. The acts of the defendant do not harmonize with any intent to make Reno or any place in Nevada her permanent residence. She went there wholly unacquainted; she had no means of support, save and except furnished as herein stated. True, she said she began to attend a business college, but her own answers as to when she began to attend, when she ceased, the name of the college, and the cost of tuition render the whole story incredible." [14] (Emphasis added.)

It remains to be added that the evidence in the record traces the money paid for the policy to the commercial account in which were deposited the earnings of the period. If moneys from other sources, such as interest on savings accounts, stocks and bonds and the like, went into the same account, the co-mingling does not stand in the way of the assertion of the rights of the wife under the law of California, especially when they arise from a marriage of such long duration.[15]

---

[13] National City Bank of New York v. Hotchkiss, 1913, 231 U.S. 50, 56, 34 S.Ct. 20, 21, 58 L.Ed. 115.

[14] Warren v. Warren, 1932, 127 Cal. App. 231, 240, 15 P.2d 556, 559.

[15] See, In re Freitas, D.C.Cal. 1936, 16 F.Supp. 557, 562; and see cases cited in Note 1. These cases state the rule which has been followed consistently by the courts in California in deci-

sions which are binding on us: See, Fountain v. Maxim, 1930, 210 Cal. 48, 50, 51, 290 P. 576; Falk v. Falk, 1941, 48 Cal.App.2d 762, 767, 768, 120 P.2d 714; Truelsen v. Nelson, 1941, 42 Cal.App.2d 750, 754, 109 P.2d 996; Buehler v. Buehler, 1946, 73 Cal.App.2d 472, 474, 166 P.2d 608; Pedder v. Commissioner, 9 Cir., 1932, 60 F.2d 866, 867, 868.

**62**

## V. Conclusion

 The discussion which precedes compels the following conclusions:

(1) W. C. Fields was domiciled in California on March 8, 1934, when he paid to the complainant the sum of $26,500.00, for the annuity insurance contract.

(2) The sum of $26,500.00, paid by W. C. Fields, was derived from his earnings as an actor while domiciled in California.

(3) The earnings and, consequently, the money paid for the annuity insurance contract were the community property of W. C. Fields and Harriet V. Fields.

(4) The payment of the sum of $26,500.-00 for the insurance contract, the proceeds of which were to be paid to Walter Fields and Adel C. Smith, on March 8, 1934, was a gift of the community property.

(5) The gift was made without the wife's knowledge or consent, expressed or implied, is invalid, as to her portion of the community property, and she is entitled to recover the unpaid portion of the insurance contract now on deposit in the registry of the court.

### Supplemental Opinion and Order on Motions

The motions of Walter Fields and Adel C. Smith, filed on November 17, 1948, to vacate the Order of Submission and to permit the introduction of additional testimony, and for an order requiring the production of documents, heretofore argued and submitted, are now decided as follows:

The said motions are, and each of them is, hereby denied.

### Comment

The motions seek, in effect, a different judgment from that announced in the decision filed on November 1, 1948. Without questioning their timeliness or propriety (see Brooks Bros. v. Brooks Clothing Co., D.C.Cal.1945, 5 F.R.D. 14), they were given a full hearing, which included the reception of additional testimony of the widow, Harriet V. Fields. This was done, in order that the motions might be disposed of before the Findings are signed and filed, and to avoid motions thereafter based on similar grounds under Rules 52(b) and 59, Federal Rules of Civil Procedure, 28 U.S.C.A.

 A full consideration of the facts and the law presented on the motions, leads me to the conclusion that the new evidence offered,—even if it be assumed that it satisfies the other requirements as to newly discovered evidence,—is not of a character which would call for a finding, as proposed in Objection II, to-wit: "that the decedent and the defendant Harriet V. Fields entered into a property settlement under the laws of the State of New York while both of said parties were domiciled in said State." The uncontradicted testimony of the widow, Harriet V. Fields, repeated at the hearing on these motions, is that no property settlement, written or oral, was ever entered into by her and the deceased, W. C. Fields, at any time, either in New York or in California. The statements in the widow's letters relating to receipts of moneys over a period of years (from 1914 to 1944), which are summarized in the digest of letters filed with the motions and as to which she was examined orally at the hearing, are nothing more than acknowledgments of receipt of various sums of money. Their tone is, at times, sarcastic and the answering letters of the deceased, to which the digest refers, are similar in spirit. On the whole, they are of the same type as the letters which were before the court at the trial of the case. They show, only, as did her testimony at the trial, that the wife, at various times, took, for her support, the amounts which the deceased, in his lifetime, gave her, increasing them or reducing them as he willed, she at times protesting, at others acquiescing. They do not tend to prove an agreement to accept the weekly payments in lieu of her widow's right to claim personal property from Fields' estate.

 Much less do they disclose any understanding that they were to continue during the lifetime of the widow. In brief, they fail to comply with the essential requirements of such contracts as set forth in the very cases relied on by the movants. See especially, the language of the court in Re Burridge's Estate, 1933, 261 N.Y. 225, 185 N.E. 81, at page 82.

As succinctly put elsewhere: *"To constitute a postnuptial settlement, the act creating it must be clear and unequivocal".*

41 C.J.S., Husband and Wife, § 89, page 562. (Emphasis added.) The widow's specific and unequivocal denials of any agreement or understanding that could be construed as a postnuptial agreement in lieu of support, both at the trial and at the hearing, are not weakened by the wording of any of these letters. Nor are they detracted from by the self-serving declarations made by the decedent to his attorney and his auditor in 1937 or 1938 concerning an alleged "property agreement" which are mentioned in counsel's affidavit and other documents filed in support of the motions.

These declarations are of the same character as the decedent's declarations as to residence which were offered at the trial, and which the Court refused to accept as determinative of residence, for the reasons stated in the opinion filed on November 1, 1948. In sum, the evidence proffered is unsubstantial, is merely cumulative, and *would not lead* to a different conclusion than that announced on November 1, 1948.

Hence the ruling above made. The objections to the proposed Findings and proposed amendments thereto have been considered, and are overruled. The Court's Findings and Judgment are filed and entered simultaneously herewith.