**BANK–FUND STAFF FEDERAL CREDIT UNION, Appellant,**

v.

**Milko CUELLAR, et al., Appellees.**

**Guillermo VIVADO, et al., Appellants,**

v.

**BANK–FUND STAFF FEDERAL CREDIT UNION, et al., Appellees.**

Nos. 91–CV–1325, 92–CV–282.

District of Columbia Court of Appeals.

Argued Jan. 19, 1993.
Decided March 15, 1994.

---

Worthington H. Talcott, Jr., Bethesda, MD, for appellant in No. 91–CV–1325 and for appellees in No. 92–CV–282.

Daniel S. Roth, Washington, DC, for appellees in No. 91–CV–1325 and for appellants in No. 92–CV–282.

Before ROGERS, Chief Judge, SULLIVAN, Associate Judge, and MACK, Senior Judge.

ROGERS, Chief Judge:

These consolidated appeals involve the right to cure residential mortgage foreclosure defaults under D.C.Code § 45–715.1 (Repl.1990).[1] In the first appeal, No. 91–CV–1325, appellant Bank–Fund Staff Federal Credit Union sued the Vivados, appellees,[2] for possession of real property and now appeals from the grant of summary judgment to appellees. The Bank–Fund contends that the trial judge erred (1) in ruling that the Bank–Fund's statutory notice of foreclosure was deficient for failure to include a statement of the amount necessary to cure the Vivados' loan default, despite a finding that the Vivados had actual notice of the amount needed, and (2) in determining on summary judgment that the mortgage loan was a "residential mortgage" under D.C.Code § 45–715.1 (Repl.1990). We hold that the foreclosure notice was invalid for two reasons: it erroneously stated that the Vivados did not have a right to cure and it failed to include the cure amount. Consequently, the Bank–Fund lacked standing, as the trial judge ruled, to obtain possession of the property.

In the second appeal, No. 92–CV–282, the Vivados,[3] having obtained a preliminary injunction to prevent the Bank–Fund et al. (and their trustees, employees and agents) from proceeding with the foreclosure on their home, contend that the motions judge erred in requiring them to pay, as security for the injunction, an amount equal to their monthly mortgage payments under the first and second trusts on the property. While we find no abuse of discretion by the motions judge in requiring security in such an amount, see Super.Ct.Civ.R. 65(c), consistent with our holding in the first appeal, we hold that the

Milko Cuellar is Mrs. Vivado's son and Mr. Vivado's stepson. For ease of reference, we refer to appellees in the first appeal as the Vivados since they are the appellants in the second appeal. See infra note 3.

3. Appellants in the second appeal are Guillermo Vivado and Dalia Vivado. See supra note 2.

1. By order of February 2, 1993, the court, following oral argument, ordered sua sponte in Appeal No. 91–CV–1325 that the appeals be consolidated "[i]nasmuch as related issues are presented."

2. In Appeal No. 91–CV–1325, appellees are Milko Cuellar, Guillermo Vivado, and Dalia Vivado.

cure amount stated in the foreclosure notice must be accurate, and because the record does not permit us to determine whether the cure amount was accurately stated in the foreclosure notice, a remand is required.

Accordingly, we affirm the grant of summary judgment to the Vivados in the first appeal, No. 91–CV–1325, and we remand the case to the trial court in the second appeal, No. 92–CV–282, to afford the Bank–Fund an opportunity to show that the cure amount stated in the November 25, 1991, foreclosure notice was properly based on amounts secured by the property at issue.

## I.

The property at issue is a private, single-family residence in the District of Columbia. It is undisputed that on April 1, 1986, Guillermo and Dalia Vivado borrowed $36,000 from the Bank–Fund in order to pay off a seller take-back second trust given in 1983, when the Vivados originally bought their house at 4313 Embassy Park Drive, N.W.[4] It is also undisputed that the Vivados defaulted on their obligations.[5] On May 4, 1990, the Bank–Fund instituted foreclosure proceedings by mailing notice to the Vivados in LaPaz, Bolivia and to the Recorder of Deeds for the District of Columbia. The notice, on the Recorder of Deeds' standard form—"Notice of Foreclosure Sale of Real Property or Condominium Unit"—stated that $46,397.73 plus expenses was the minimum balance required to cure the default obligation and reinstate the mortgage loan. A foreclosure sale set for June 6, 1990, did not occur as a result of an automatic stay under the bankruptcy laws. It was not until after the bankruptcy court modified the automatic stay, that the Bank–Fund was able to proceed with foreclosure proceedings.[6]

On August 6, 1990, the Bank–Fund mailed a foreclosure notice to the Vivados' Bolivian address and to the Recorder of Deeds setting September 5, 1990, as the date of the foreclosure sale. The August 6, 1990 notice, also on the Recorder of Deeds' standard form, unlike the May 4, 1990, notice, did not indicate the "amount to cure." Instead, in the space on the Recorder's standard form designated—"Minimum balance required to cure default obligation pursuant to D.C.Law 5–82 'Right to Cure a Residential Mortgage Foreclosure Default Act of 1984'"—the Bank–Fund had written "N/A—not a 'residential mortgage.'"

By letter of September 7, 1990, counsel for the Bank–Fund advised counsel for the Vivados, referring to an agreement reached on September 5, 1990, that in exchange for a payment by them of $20,000 to be applied toward the balance of the loan, the Bank–Fund agreed to postpone the foreclosure sale until October 3, 1990, in order to afford the Vivados a "limited opportunity to pay-off the mortgage loan" on the property. The letter also stated that "[i]t is understood that reinstatement of the mortgage loan account will not be permitted and that no further continuances will be granted."[7] The letter stated that the amount required to pay off the loan was $98,753.80. According to the Bank–Fund, the Vivados were unable to raise the necessary funds, and the Bank–Fund purchased the property at the foreclosure sale

---

**4.** The purchase price was $204,000. The property was also encumbered by a first deed of trust in the amount of $135,000 held by Washington Federal Savings Bank.

**5.** When the prior lienholder moved to foreclose on the home, the Vivados filed for bankruptcy, on January 21, 1988. The bankruptcy court found the Vivados to be ineligible for bankruptcy protection.

**6.** On June 5, 1990, appellee Guillermo Vivado filed for bankruptcy protection under chapter 13 of title 11 of the U.S.Code. In his sworn bankruptcy petition, appellee responded affirmatively to the statement "[p]etitioner has been domiciled within this district for the proceeding 180 days, or for a longer portion of the preceding 180 days than in any other district." The bankruptcy proceeding was dismissed, pursuant to the trustee's motion to dismiss, on September 21, 1990.

**7.** The letter requested confirmation of the agreement by return of a signed copy of the letter. No such return appears in the record. However, in their answers to interrogatories, the Vivados acknowledged the September agreement: "Exhibit H accurately represents the essence of the agreement reached between Guillermo Vivado and the Credit Union on 9–5–90, although no specific figures were discussed at that time."

on October 3, 1990.[8]  On March 28, 1991, the Embassy Road property was conveyed by deed to the Bank–Fund.

On April 12, 1991, the Bank–Fund filed suit for possession against the Vivados on the ground that they were wrongfully holding over as former owners.  A consent protective order was entered by praecipe dated May 8, 1991.[9]  In their answer to the complaint, the Vivados asserted that the complaint for possession should be dismissed because of defects in the foreclosure sale.  The Bank–Fund filed a motion for summary judgment and stated, as material facts not in dispute, that the Vivados were "at all relevant times to these proceedings" living in Bolivia, that they had received the notice of foreclosure required under § 45–715.1(b), and that following proper advertisement the property was sold to the bank at the foreclosure sale on October 3, 1990.  The Bank–Fund argued that "[u]pon information and belief, the property was rental property and, therefore, the Bank–Fund loan did not satisfy the definition of a 'residential mortgage' under the statute."  Alternatively, the Bank–Fund argued that even if the Vivados were entitled to have their loan reinstated under the statute, the notice was not deficient because the "amount to cure" was not required by § 45–715.1(b) to be in the foreclosure notice.  Furthermore, argued the Bank–Fund, the Vivados' counsel had informed the Bank–Fund on September 5, 1990, that they did not have the money needed to cure the default and reinstate the loan.  Additionally, the Bank–Fund argued that even if the Vivados had sufficient funds on September 5, 1990, the date of the foreclosure sale, neither the statute nor the loan documents required the Bank–Fund to permit reinstatement at that time.  The Bank–Fund also referred to an agreement of September 5, 1990, negotiated by counsel for the parties, whereby the sale was postponed until October 3, 1990, to afford time for the Vivados to pay off the delinquent loan account.

The Vivados opposed the motion for summary judgment on factual and legal grounds.  They claimed that the issue of whether the foreclosure was defective because the Bank–Fund denied them their right to cure under § 45–715.1 constituted a material disputed fact.[10]  The Vivados also argued that the Bank–Fund's motion for summary judgment was deficient under Super.Ct.Civ.R. 12–I(k) since it was unsupported by admissible evidence or references to the record to show, for example, that the Vivados did not have sufficient money on September 5, 1990, to bring current the amount of the loan.  In addition, they argued that it was irrelevant whether or not they had the money to cure on September 5, 1990, since the statute afforded them five days within which to come up with the necessary amount.  The Vivados further argued that the Bank–Fund was not entitled to judgment as a matter of law because § 45–715.1, and the regulations enacted pursuant to it, indicate that the Mayor, through the Recorder of Deeds, provides the standard disclosure form, which must be completed accurately, subject to criminal penalties.  According to the Vivados, the Bank–Fund's August 6, 1990, notice failed to comply with these requirements.  Finally, the Vivados argued that the Bank–Fund, by stating in the foreclosure notice that they had no right to cure, denied them the right to reinstate and possibly deprived them of

---

**8.**  It appears that the parties made an additional effort to resolve the matter.  A letter of October 10, 1990, from counsel for the Bank–Fund to new counsel for the Vivados refers to "a fully executed Assignment dated 10–10–90," whereby the Vivados were to make a second deposit by October 26, 1990, and complete settlement by November 8, 1990.  A copy of the executed assignment appears in the record.  The Vivados conceded in their answers to interrogatories that this was a true and accurate copy of the original signed by Guillermo Vivado and that "[j]ust a couple of weeks before settlement could have finally taken place, the Credit Union registered the property."

**9.**  Under the protective order appellees were to pay $2,000 on or before May 24, 1991, $2,000 on or before June 14, 1991, and thereafter $2,000 on the first of every month.

**10.**  The Vivados also asserted as a material fact in dispute whether "after the foreclosure sale [the Bank–Fund's] refusal to go to settlement under an arrangement by which [the Vivados] would cash the [Bank–Fund] out acts to estop the [Bank–Fund] from judgment of possession."  *See supra* note 8.

knowledge they needed to get the necessary funds.

The Vivados also filed a cross-motion for summary judgment, which included a statement of material facts not in dispute supported by exhibits and an affidavit, to the effect that the second deed of trust was given to refinance the original purchase of their home on Embassy Park Drive and that it was, in fact, their home. An affidavit of appellee Guillermo Vivado, attached to the motion, stated that in September 1988, Mr. Vivado "was caused to temporarily leave the country on a work assignment," and that Mrs. Vivado had accompanied him, "both intend[ing] to return to the D.C. house after the assignment was over." The affidavit also stated that the Vivados' son had lived in the house while attending college for the entire time, except for several months in late 1989 and early 1990 when a friend of their son was allowed to live in the house, and that since June 1990, the house had been occupied by family members. Further, the affidavit stated that several months after his return from abroad Mr. Vivado "again had cause to frequently leave the country for work, but was present in D.C. during parts of the foreclosure period." In addition, the affidavit stated that "[t]he Vivados intend to return to the house on a permanent basis once this assignment is finished, which they hope will be later this year."

Although initially granting the Bank–Fund's motion for summary judgment as unopposed,[11] the trial judge held a hearing on the Vivados' motion for reconsideration.[12] At the hearing, the Vivados maintained that they had been prejudiced by the failure of the Bank–Fund to include an "amount to cure" in the August 6, 1990, foreclosure notice because they were unaware of the amount of money they needed to collect in order to effect a cure, particularly in view of statements by the Bank–Fund that reinstatement of the mortgage was not an available option. Furthermore, they argued, by short-circuiting the legislative scheme envisioned by § 45–715(b), the Bank–Fund had left the Office of the Recorder of Deeds with insufficient information to be able to alert them that they had a right to reinstate the loan.

While conceding that the loan documents required reinstatement, the Bank–Fund took the position that the Vivados could not fairly claim prejudice as a result of the omission in the August 6, 1990, foreclosure notice because the May 4, 1990, notice had stated that the "amount to cure" was $46,397.73 plus expenses.[13] In addition, the Bank–Fund explained the reasons for the omission in the August notice. Following the May 4, 1990, foreclosure notice, counsel told the trial

11. Counsel for the Vivados filed an emergency motion for stay of judgment of possession, stating that he had first learned of the grant of the Bank–Fund's motion for summary judgment on Friday, August 30, 1991, and he filed a motion for reconsideration on behalf of the Vivados. Counsel advised that an opposition to the Bank–Fund's motion was not timely filed because of "an error in identifying the correct date for response by confusing said date with the response date for [the Bank–Fund's] motion for sanctions," and noting that the latter response had been filed ten days earlier than necessary. Counsel also pointed to considerable work done with the Vivados in preparing materials to contest the motion for summary judgment.

12. In granting the Bank–Fund's unopposed motion for summary judgment the trial judge had ruled:

The failure to insert a reinstatement figure in the statutory notice does not invalidate an otherwise proper notice. The statute has no provision which requires any such figure be provided and as a practical matter any figure inserted would only be an estimate of the amount necessary to reinstate the loan account.

By agreement negotiated between counsel for the parties on the date of the September 5, 1990 foreclosure sale and memorialized by letter agreement dated September 7, 1990, the foreclosure sale was postponed until October 3, 1990 to afford the Vivados an additional opportunity to pay-off their delinquent loan account. The Defendants did not pay and neither the statute nor the loan documents required the Bank–Fund to permit reinstatement at that time. The Bank–Fund granted the Vivados more time than either the statute or the loan documents required. The Vivados were simply unable to satisfy their contractual obligations.

13. Counsel for the Bank–Fund argued that "[f]or [appellees] to say that they had absolutely no idea as to the amount to reinstate in August, when they got a figure on the May statutory notice, is absurd."

judge that representatives of the Bank–Fund had visited the property and discovered that a non-family member was living in the house, and the Bank–Fund had, therefore, concluded that the property could no longer be considered a "residential mortgage" under D.C.Code § 45–715.1 (Repl.1990). The Bank–Fund also argued that even if the Vivados still had a right to reinstate the loan, the issue of whether they could reinstate was moot since they had shown up at the September sale with insufficient funds to do so.[14]

The trial judge reasoned that he first had to resolve "whether or not the statute can be reasonably construed to require the cure figure to be placed on the foreclosure form," and if so, then whether its exclusion was fatal to the foreclosure. The trial judge concluded:

> I am satisfied, first of all, that the defendants did have notice or should reasonably have had notice given what was provided in months prior to the actual foreclosure procedure. Nevertheless, it is my experience in these matters that when it comes to matters as fundamental as a person's home and property, that the laws which have been promulgated operate presump-

tively in favor of the homeowners when the homeowners' interests and that of the creditors come into conflict.

The trial judge granted the Vivados' motion for reconsideration,[15] and although initially stating that there were issues remaining to be resolved, he vacated summary judgment for the Bank–Fund and granted the Vivados' motion for summary judgment on the ground that the Bank–Fund lacked standing to bring an action of possession because the August 6, 1990, notice of foreclosure was defective.[16] The grant of summary judgment to the Vivados is the subject of the first appeal, No. 91–CV–1325.

The trial judge found that the mortgage at issue was a residential mortgage under D.C.Code § 45–715.1 (Repl.1990) and that the right to reinstate was therefore applicable. The judge also found that appellees "knew or reasonably should have known of the approximate amount needed to reinstate their mortgage loan." However, while noting that there was no specific caselaw on point, the judge observed that although "[t]he case boils down to a technicality.... [T]he law is made up of technicalities, which become particularly acute in such fundamental matters

14. Counsel for the Bank–Fund stated that:

> If [the Vivados] had come in and requested reinstatement or if they had tendered reinstatement, that would have been accomplished. The simple fact is they did not have the funds available to reinstate and that is why the agreement set forth in the letter of September 7th was entered into, through representation of prior counsel of [the Vivados].
>
> They showed up at the September sale with insufficient funds to reinstate. They had $20,000 on that date, but by all calculations, that wasn't even sufficient to reimburse the advances the Bank Fund had been making over the years to keep the First Trust current. What the Bank Fund did was enter into an agreement on the date of the September foreclosure sale to postpone that sale and afford them a limited opportunity to come in and satisfy the loan. They were not even outside of the 5–day time frame when that occurred.

The reference to five days refers to D.C.Code § 45–715.1. *See infra* Part II.

15. In response to the Bank–Fund's concern that the protective order payments were not being made, the trial judge stated: "[i]f all the money is not in the Court Registry, I am inviting the plaintiff to file a motion to impose appropriate sanctions under the rules.... This case is not

over and the Court certainly has the power to strike whatever pleadings and/or defenses or anything else as a sanction for the defendants' failure to properly comply with the Court Order." The trial judge never addressed this issue, as counsel for the Vivados convinced him that the cross-motion for summary judgment had to be granted as a result of the defective foreclosure notice. On appeal, the Bank–Fund asserts that granting judgment in favor of the Vivados without resolving whether the protective order was violated was an abuse of discretion. For the same reasons as the trial judge, namely a defective notice, we need not reach this issue.

16. The Vivados then called their cross-motion for summary judgment to the trial judge's attention. The trial judge initially declined to rule in their favor, stating that "[t]here are still issues that need to be flushed out here, I think." Counsel for the Vivados interjected, however, that if the trial judge was ruling that the foreclosure notice was invalid, then the Bank–Fund had no standing to bring the possession action in landlord-tenant court. Although the Bank–Fund argued that issues of fact remained which still had to be resolved, the trial judge granted the Vivados' motion for summary judgment, agreeing that because the possession action was before the court on invalid notice, it had to be dismissed.

as a person's home, property rights, and attendant considerations of due process and equal protection." The judge stated that:

> In the Court's experience, when a dispute over an interpretation of the law arises between a creditor and a homeowner as relating to an ambiguity in the law, the courts of this jurisdiction will ordinarily construe the law in favor of the homeowner.
>
> Therefore, it is the ruling of this Court that the foreclosure notice in this case, which lacked a statement of the figure needed to cure the default obligation, rendered the notice, and the foreclosure sale, fatally defective.

Thereafter, by foreclosure notice dated November 25, 1991, the Bank–Fund reinstituted foreclosure proceedings, setting the auction date for December 27, 1991. Although this time the foreclosure notice did state the minimum amount required to effect a cure, the Bank–Fund placed this figure at $214,550.58, plus interest and expenses.[17] On December 18, 1991, the Vivados moved for a preliminary injunction, pursuant to Super.Ct.Civ.R. 65, to enjoin the Bank–Fund from proceeding with the foreclosure sale. The Vivados obtained a temporary restraining order, and thereafter, the motions judge issued a preliminary injunction requiring the Bank–Fund to suspend all proceedings in furtherance of the foreclosure sale. As security for the injunction, the motions judge ordered the Vivados to pay an amount equal to their monthly mortgage obligations under the first and second trusts into an escrow account and to maintain hazard insurance on the property. The secured injunction is the subject of the second appeal, No. 92–CV–282.

## II.

■ *Appeal No. 91–CV–1325:* The Bank–Fund contends that the trial judge erred as a matter of law in concluding that the statutes and regulations required the Bank–Fund to include an amount to cure figure as part of the statutory foreclosure notice it provided to the Vivados in August, 1990. Alternatively, the Bank–Fund maintains that even if the amount to cure must be stated in notice of foreclosure, the trial judge erred in ruling that defective notice is *per se* fatal to the corresponding foreclosure sale. Finally, the Bank–Fund asserts, on several grounds, that the trial judge erroneously determined on summary judgment that the Vivados' mortgage was a residential mortgage within the meaning of § 45–715.1.

D.C.Code § 45–715(b) provides that a foreclosure sale cannot take place until the holder of the note gives thirty days written notice to the owner of the encumbered real property.[18] The thirty days start to run once the Mayor, or the Mayor's agent, has given written acknowledgment to the holder of the note, or its agent, on the date notice is received. The statute provides, further, that the "notice shall be in such format and contain such information as the Council of the District of Columbia shall by regulation prescribe." D.C.Code § 45–715(b). The regulations enacted by the Council provide, in turn, that the notice shall be on a form developed by the Mayor and available at the Office of the Recorder of Deeds.[19] The regulations

---

17. This figure apparently pertained to money owed under the Bank–Fund's second trust as well as the first trust.

18. D.C.Code § 45–715(b) provides in pertinent part:

> No foreclosure sale under a power of sale provision contained in any deed of trust, mortgage or other security instrument, may take place unless the holder of the note secured by such deed of trust, mortgage, or security instrument, or its agent, gives written notice, by certified mail return receipt requested, of said sale to the owner of the real property encumbered by said deed of trust mortgage or security instrument at his last known address, with a copy of said notice being sent to the Mayor of

the District of Columbia, or his designated agent, at least 30 days in advance of the date of said sale. Said notice shall be in such format and contain such information as the Council of the District of Columbia shall by regulation prescribe.

19. The regulations, specifically 9 DCMR § 3100.1 (1986), provide, in part, that:

> *The holder of a note secured by a deed of trust, mortgage, or other security instrument ... shall* at least thirty (30) days in advance of any sale of the real property encumbered by such deed of trust, mortgage or security instrument under a power of sale provision contained therein, send to the owner of the real property, by certified mail, return receipt requested, a

also require that the notice shall "at least" include information identifying the persons and property affected and the noteholder's certification of use of certified mail and of the thirty-day waiting period.[20] It is undisputed that at all relevant times at issue, the form available in the Recorder of Deeds Office included a space for designation of the "Minimum balance required to cure default obligation pursuant to D.C.Law 5–82 'Right to Cure a Residential Mortgage Foreclosure Default Act of 1984.'"

The Right to Cure a Residential Mortgage Foreclosure Default Act of 1984, is codified at D.C.Code § 45–715.1. In subsection (a), the statute defines a "residential mortgage" as:

> a loan used to acquire or refinance property which is a single family dwelling, including a condominium or cooperative unit, which is the principal place of abode of the debtor or the debtor and his immediate family.

Subsection (b) establishes the right to cure:

> [n]otwithstanding the provisions of any other law, after a notice of intention to foreclose a residential mortgage has been given pursuant to § 45–715, at any time up to 5 business days prior to the commencement of bidding at a trustee sale or other judicial sale on a·residential mortgage obligation, the residential mortgage debtor or anyone in his [or her] behalf, not more than 1 time in any 2 consecutive calendar years, may cure his [or her] default and prevent sale or other disposition of the real

estate, by tendering the amount or performance specified in subsection (c) of this section.

Subsection (c) provides that to cure a default, the debtor must pay in cash, cashier's check, or certified check, "all sums, including any reasonable late penalty, required to bring the account current, with the exception of any amounts due by operation of any acceleration clause that may be included in the security agreement," as well as "[p]erform any other obligation which he would have been bound to perform in the absence of default or ... an acceleration clause," and pay or tender any expenses associated with the foreclosure.

We hold that the August 6, 1990, foreclosure notice was defective as a matter of law because it erroneously stated that the Vivados did not have a right to cure and did not include the amount necessary to cure as required by the Recorder of Deeds' standard form. *See Holland v. Hannan*, 456 A.2d 807 (D.C.1983) (standard of review).

### A.

■ As to inclusion of the cure amount, a requirement for inclusion of the amount necessary to cure in the foreclosure notice is clearly a reasonable interpretation by the Recorder of Deeds of the statute and regulations. *See Boer v. District of Columbia Rental Hous. Comm'n*, 564 A.2d 54, 57–58 (D.C.1989) (court will defer to reasonable interpretation of statute by agency entrusted with its enforcement). Inclusion of the cure amount in the foreclosure notice provides the

---

notice of such foreclosure sale on a form to be provided by the Commissioner of the District and to be available at the Recorder of Deeds, D.C.....

**20.** The regulations, 9 DCMR § 3100.2 (1986), require (emphasis added) that:

> The form of such notice of foreclosure sale of real property shall provide for furnishing *at least* the following information concerning such sale:
> (a) The name· and address of the owner of record of the property, and his or her telephone number, if known;
> (b) The identification of the property;
> (c) The lot and square number or the parcel number of the property;
> (d) The liber number and folio number of the volume in the Office of the Recorder of

Deeds in which the security instrument is recorded and the date of such recordation;
> (e) The name and last known address of the maker of the note secured by the security instrument, and his or her telephone number, if known;
> (f) The name and address of the holder of the note and his or her telephone number of the person to call if owner wishes to stop foreclosure; and
> (g) Provision for a certification by the note holder or his or her agent that the original of the notice has been sent to the property owner by certified mail,. return receipt requested, and that the note holder understands that no foreclosure sale may take place until at least thirty (30) days after a copy of the notice has been received by the Recorder of Deeds, D.C.

homeowner with vital information on a timely basis, affording to the homeowner such information during the full notice period, further enhancing the likelihood that foreclosure can be avoided. It also avoids potential disputes at a later time, as in the instant case. Early notice of the cure amount, moreover, facilitates possible resolution of disputes about the amount to cure. *See Young v. Ridley*, 309 F.Supp. 1308, 1311 (D.D.C.1970) (discussing the legislators' intent in enacting the reinstatement statute).

■ Furthermore, inclusion of the cure amount in the foreclosure notice is consistent with the court's strict construction of foreclosure statutes in favor of homeowners. *See Independence Fed. Sav. Bank v. Huntley*, 573 A.2d 787, 788 (D.C.) (noting that "[o]ther courts have held that under trust deed foreclosure statutes similar to § 45–715(b), 'the terms of [such] statutes must be strictly complied with, in order to satisfy the due process requirements of notice and opportunity to be heard' ") (quoting *Security Pac. Fin. Corp. v. Bishop*, 109 Idaho 25, 704 P.2d 357, 359 (App.1985)), *cert. denied*, 498 U.S. 853, 111 S.Ct. 148, 112 L.Ed.2d 114 (1990). This reluctance to interpret trust deed foreclosure statutes against homeowners is evidenced in *Independence Fed. Sav. Bank v. Huntley*, *supra*, where the court affirmed a judgment of liability against a bank for wrongful foreclosure and wrongful eviction where the homeowner was not given written notice by certified mail thirty days in advance of the foreclosure, notwithstanding actual notice to the homeowner sixteen days in advance of the foreclosure sale and the homeowner's presence at the sale. 573 A.2d at 788. Even more clearly than in *Independence Fed. Sav. Bank v. Huntley*, *supra*, the fact that, in the instant case, the Vivados knew the cure amount as of the May 4, 1990, foreclosure notice could not excuse the Bank–Fund from its obligation to include the cure amount in the August 6, 1990, foreclosure notice on the ground that the Vivados knew the amount.

Indeed, under § 45–715.1(c), the amount to cure under the second trust would have changed if the Bank–Fund had incurred additional costs between May 4 and August 6.

While the rule may seem technical, it places on the party best able to produce the information the obligation to make certain it is included in the foreclosure notice, thereby lessening the possibility of errors. It also has the advantage of clarity—a clear rule should work to the benefit of both the homeowners and the creditor, thereby avoiding the protracted type of proceedings currently at issue.

### B.

■ As to the Vivados' continuing eligibility to cure, the Bank–Fund, anticipating that the court might interpret the statute to require inclusion of the cure figure, contends that summary judgment was inappropriate because the nature of its loan to the Vivados changed between May 4, 1990, and August 6, 1990 (the dates of the two foreclosure notices). It bases this solely on the claim that during that time period, the Vivados were residing in Bolivia and using the Embassy Drive home as a rental property.[21] Given what it views as a change in status for the purposes of § 45–715.1, the Bank–Fund maintains that despite the omission of the cure figure, the trial judge erred in finding on summary judgment that the mortgage constituted a residential mortgage at the time the Bank–Fund instituted foreclosure proceedings in August 1990. Since the statutory right to reinstate only applies to residential mortgage foreclosure default, the Bank–Fund maintains that factual issues remained regarding who was living in the home. In its motion for summary judgment, the Bank–Fund asserted on the basis of "information and belief" that the property was rental property, and therefore the Bank–Fund loan did not fall within the statutory meaning of "residential mortgage" under

---

21. The Bank–Fund does not contest that the original loan was for the purpose of financing the purchase of appellees' residence in the District of Columbia. Nor has it proffered documentary or other evidence to show that the loan that it made to appellees was not used by appellees to pay off

the seller's take-back second deed of trust note. Rather, the Bank–Fund maintains that the loan had ceased to be a "residential mortgage" because, "on information and belief," a non-family member was living in the Embassy Drive home at some time after May 4, 1990.

§ 45–715.1. The Vivados responded to this assertion in their cross-motion for summary judgment, to which was attached appellee Guillermo Vivado's affidavit admitting that a non-family member was staying in the home for a brief time, but averring that by June of 1990 family members had returned to the home, and that he and Mrs. Vivado intended to return to the home upon completion of his temporary work assignment.

■ Generally, where questions of intent are at issue, summary judgment is inappropriate. *Beckman v. Farmer,* 579 A.2d 618, 630 (D.C.1990) (citations omitted); *Leeks v. Leeks,* 570 A.2d 271, 274 (D.C.1989) (citations omitted); *Spellman v. American Sec. Bank, N.A.,* 504 A.2d 1119, 1122 (D.C.1986) (per curiam) (citation omitted). However, intent is a relevant issue in the instant case only if the statutory remedy of reinstatement is unavailable to the Vivados. That is, assuming as the Bank–Fund alleged, that the Vivados had allowed a non-family member to live in the home while they were out of the country and that they were renting their home during 1990 to a non-family member, would this action operate to terminate the mortgage's residential status under § 45–715.1 and thus terminate the corresponding statutory right to cure?

■ A fair reading of the language of the statute makes clear that the right to cure was intended to be a generally available remedy for defaults on residential mortgages.[22] Under § 45–715.1(a), a "residential mortgage" is broadly defined. By contrast with statutes in other jurisdictions, where the definition of the eligible debtor class is more precisely defined and thereby limited, the District's statute does not include minimum or continuous residency requirements, as appear, for example, in Connecticut's foreclosure statute.[23] Nor did the legislature include size of lot or other limitations, as appear, for example, in the Illinois statute.[24] Unlike other statutes where the D.C. Council has precisely defined the eligible class, its failure to define "principal place of abode" in more explicit terms lends further support to the conclusion that the statute is to be construed broadly.[25]

22. *See James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C. 1989) ("[i]n interpreting a statute, we are mindful of the maxim that we must look first to its language; if the words are clear and unambiguous, we must give effect to its plain meaning") (citing *Office of People's Counsel v. Public Serv. Comm'n,* 477 A.2d 1079, 1083 (D.C.1984); *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc)).

23. Conn.Gen.Stat.Ann. § 49–31d (West Supp. 1992) defines "homeowner" in its foreclosure laws to mean:

a person who has an ownership interest in residential real property secured by a mortgage which is the subject of a foreclosure action, and who has owned and occupied such property as his principal residence for a continuous period of not less than two years immediately preceding the commencement of such foreclosure action.

24. Ill.Ann.Stat. ch. 110, para. 15–1219 (Smith–Hurd Supp.1992) defines "residential real estate" to mean:

any real estate, except a single tract of agricultural real estate consisting of more than 40 acres, which is improved with a single family residence or residential condominium units ... which residence, ... is occupied as a principal residence either (i) if a mortgagor is an individual, by that mortgagor, that mortgagor's

spouse or that mortgagor's descendants.... The use of a portion of residential real estate for non-residential purposes shall not affect the characterization of such real estate as residential real estate.

25. The court has recognized that, for purposes of statutory construction, the taxation area serves as a useful analogy. *See Independence Fed. Sav. Bank v. Huntley, supra,* 573 A.2d at 787 (calling attention to "analogous context of tax sales," where " 'strict compliance' with the tax sale statute and regulations" is required for valid conveyance of property by government) (citation omitted). The residential real property transfer excise tax statute, D.C.Code § 47–1401 (Repl. 1990), provides:

(20) The term "principal residence" shall have the same meaning as does that term for purposes of § 1034 of the Internal Revenue Code (§ 1034 of Title 26, United States Code): Except, that in determining whether a residential real property is the principal residence of a transferor, in addition to consideration of all the facts and circumstances as provided by § 1034 of the Internal Revenue Code ..., the property must have been the principal residence of the transferor for the 180–day period immediately preceding the transfer.

For purposes of real property assessment and taxation, D.C.Code § 47–803 (Repl.1990), provides:

In addition, the purposes underlying the enactment of § 45–715 make clear that the statute must be construed in favor of the homeowner. In general, states have enacted reinstatement statutes to protect homeowners from the unique danger posed by deeds of trust—namely, the fact that it is "far easier for lenders to forfeit the borrower's interest in the real estate securing a loan" because "the trustee holds a power of sale permitting him to sell the property out of court with no necessity of judicial action." *Patton v. First Fed. Sav. & Loan Ass'n*, 118 Ariz. 473, 578 P.2d 152, 156 (1978) ("[t]he Deed of Trust statutes . . . strip borrowers of many of the protections available under the mortgage. Therefore, lenders must strictly comply with the Deed of Trust statutes, and the statutes . . . must be strictly construed in favor of the borrower"); *see also Ulery– Williams, Inc. v. First Wyoming Bank*, 748 P.2d 740, 742 (Wyo.1988) (acknowledging "the relative ease with which a lender [can] foreclose by power of sale, as opposed to a judicial foreclosure").

■ These concerns are reflected in D.C.Code § 45–715, *see supra* note 18. As explained in *Young v. Ridley, supra*, 309 F.Supp. at 1310–11, the District's statutory foreclosure notice procedures were enacted for two primary reasons. First, legislators were motivated by the realization that there was "no statutory requirement that the owner be notified of an extra-judicial foreclosure sale and, therefore, there was no guarantee that a homeowner would have sufficient time before the sale to take legal action to protect himself." *Young v. Ridley, supra*, 309 F.Supp. at 1310. Thus, the legislators hoped that the thirty-day notice requirement would afford homeowners sufficient time to seek remedies. *Id.* at 1311. Second, the legislators envisioned that the District government would investigate the foreclosure upon receiving the notice and inform the homeowner of the impending sale and any abuses. *Id.* Both of these policies underscore the need to construe the statute in favor of appellees in the instant case. The legislature clearly sought to provide a right of reinstatement that would avoid the loss to the homeowner of his or her home simply upon a default in making a mortgage payment. *Cf. id.* at 1310–11. By providing additional time to the homeowner to make the loan current, the legislature sought to avoid the likely effect when the entire loan payment becomes due upon a default. *See Independence Fed. Sav. Bank v. Huntley, supra*, 573 A.2d at 788 ("the purpose of the 30–day notice provision is to allow the owner substantially more time than plaintiff received to 'cure his default' in regard to the property").

Thus, under the District's foreclosure statutes, the issue is simply whether the Vivados were using the Embassy Drive home as their "principal place of abode." D.C.Code § 45–715.1, *supra* at 15–16. The legislature did not provide a definition of this phrase and the court must, accordingly, construe the words "according to their ordinary sense and with the meaning commonly attributed to them." *Davis v. United States*, 397 A.2d 951, 956 (D.C.1979); *Peoples Drug Stores, Inc. v. District of Columbia, supra* note 22, 470 A.2d at 755 ("a court should look beyond the ordinary meaning of the words of a statute only where there are 'persuasive reasons' for doing so") (citation omitted); *cf. District of Columbia v. H.J.B.*, 359 A.2d 285, 290 (D.C.

(5) The term "nontransient" means occupancy of a dwelling unit or units by any person(s) for a period of more than 5 consecutive days during any 1 stay in such unit(s).

(6) The term "single family residential property" means real property improved by a dwelling unit which is used exclusively for nontransient residential purposes and which contains not more than 1 dwelling unit. . . .

In addition, for purposes of income tax, § 47–1801.4(17) (Repl.1990), defines "resident" as:

every individual domiciled within the District at any time during the taxable year, and every other individual who maintains a place of abode within the District for an aggregate of 183 days or more during the taxable year, whether or not such other individual is domiciled in the District. . . . In determining whether an individual is a "resident", such individual's absence from the District for temporary or transitory purposes shall not be regarded as changing his domicile or place of abode.

*See also* D.C.Code § 21–551(b) (Repl.1989) ("resident" for purposes of hospitalization of the mentally ill is defined as "a person who has maintained his principal place of abode in the District of Columbia for more than one year immediately prior to the filing of the petition. . . .").

1976) ("'residence' is not a term of fixed legal definition but takes on shades of meaning according to the context in which it is found") (citations omitted). Part and parcel of the Bank–Fund's contention that appellees' loan had ceased to be a residential mortgage by August 6, 1990, is the assertion that appellees were renting the Embassy Drive home to a non-family member while they were out of the country on a work assignment. Yet, the phrase "principal place of abode" implicitly embraces the concept that a homeowner may not be in continuous residence at his or her home in the District. This expansive view of the phrase follows from the fact that the legislature undoubtedly recognized that the District of Columbia is a very mobile place for a variety of reasons, not the least of which is the fact that it is the nation's capital.[26] Not only are federal government agencies located here, but the nature of federal government service may require an employee to live overseas for periods of time. For example, foreign Service officers living in the District of Columbia leave for years of service in other countries, yet continue to view that home as the principal place of abode.[27] In *Boer v. District of Columbia Rental Hous. Comm'n, supra,* 564 A.2d at 57 n. 8, the court quoted the Rental Housing Commission's observation, in another context, that:

> In a transient city such as Washington, D.C., many owners of single family houses, for example, occasionally rent their homes for a year or more when their work assignments take them elsewhere. They are not commercial landlords, in the customary sense, and should not be financially punished because they did not comply with this technical requirement [to file a notice of exemption from rental control laws].

■ Consequently, it is consistent with the remedial nature of the right to cure a residential mortgage default not to restrict the availability of the right-to-cure remedy to those who continuously live in their homes at the risk of losing their jobs.[28] The type of

26. *See, e.g., District of Columbia v. Murphy,* 314 U.S. 441, 452, 62 S.Ct. 303, 308, 86 L.Ed. 329 (1941) ("The District of Columbia is an exceptional community. It is not a local municipal authority, but was established under the Constitution as the seat of the National Government. Those in Government service here are not engaged in local enterprise, although their service may be localized").

27. It is likely as well that World Bank employees like Mr. Vivado also spend considerable time outside of the United States.

28. This concept of recognizing the special circumstances of government employees is hardly foreign to the District's statutes or our caselaw. For purposes of real estate and other taxes, the D.C.Code defines "residence" and "domicile" in a manner that does not require continuous residence. *See supra* note 25. Moreover, the caselaw on "domicile" supports the conclusion that the Vivados did not change their principal place of abode when they left the District for job-related reasons. *See, e.g., District of Columbia v. Woods,* 465 A.2d 385, 387 (D.C.1983) ("[t]he two requisites for establishing a change of domicile are '(1) physical presence, and (2) an intent to abandon the former domicile and remain [in the new one] for an indefinite period of time....'"). Even construing the facts in the light most favorable to the Bank–Fund, while the Vivados may have a significant physical presence in Bolivia, the Bank–Fund did nothing to counter the statement in Mr. Vivado's affidavit that he and his wife intended to return to the Embassy Drive home on a permanent basis once his work assignment in Bolivia was complete. *See District of Columbia v. Murphy, supra* note 26, 314 U.S. at 455 n. 9, 62 S.Ct. at 309 n. 9 ("domicile ... does not follow from mere indefiniteness of the period of one's stay. While the intention to return must be fixed, the date need not be; while the intention to return must be unconditional, the time may be, and in most cases of necessity is, contingent"); *Alexander v. District of Columbia,* 370 A.2d 1327, 1329 (D.C.1977) ("to prove that persons who have left their former dwelling places and have taken up residence in another state in order to accept work in the federal civil service are domiciled in their new location, the facts adduced must demonstrate that such persons 'have no fixed and definite intent to return and make their homes where they were formerly domiciled'") (quoting *District of Columbia v. Murphy, supra* note 26, 314 U.S. at 454–55, 62 S.Ct. at 309); *Shilkret v. Helvering,* 78 U.S.App. D.C. 178, 180, 138 F.2d 925, 927 (1943) ("'[m]ere absence from a fixed home, however long continued, cannot work the change [in domicile]'").

Of course, the goal of the legislature in enacting tax laws, presumably to maximize revenues, is different than when, as in § 45–715.1, the legislature seeks to provide a direct individual benefit to its residents. However, if such persons must bear the tax burdens associated with residence in the District, it is arguable that they should also be able to avail themselves of the statutory privileges arising from residence, such as the right to invoke the protection of the reinstatement statute.

employment situation described in appellee Vivado's affidavit is not atypical in this community. The distinction drawn in a practice manual between residential and investment properties is more in accord with the salutary remedial purpose of the statute than the Bank–Fund's position that any rental, at any time, for any period of time, regardless of whether related to employment requirements, transforms a "residential mortgage" into a loan that is no longer contemplated by the statute.[29] Nothing in the language or purpose of the statute suggests that the right to cure is to be denied to homeowners who temporarily leave their homes for employment reasons. Absent such a legislative indication, the court cannot presume that the legislature intended that homeowners who undertake job-related travel would thereby forfeit their right to cure a mortgage default and risk having their homes sold out from under them.

■■■ The Bank–Fund did not submit an opposition to the Vivados' cross-motion for summary judgment, and its own statement of material facts merely asserted that "at all times relevant to the proceedings" the Vivados have resided in La Paz, Bolivia.[30] Even construing this fact in the light most favorable to the Bank–Fund, in the absence of a "continuous residence" requirement in the reinstatement statute, the bank has failed as a matter of law to show that the statutory remedy of reinstatement was unavailable to the Vivados. The Vivados supported their cross-motion for summary judgment with an affidavit and other documents to show that the Embassy Drive home was their principal place of abode and that their absence from it was temporary and work-related. In view of the broad statutory language and purposes, a rental of the home in their absence from the country was consistent with generally known practice. *See Boer v. District of Columbia Rental Hous. Comm'n, supra,* 564 A.2d at 57 n. 8. Hence, neither the Bank–Fund's statement of material facts not in dispute nor its statement on information and belief, even viewed as proper Rule 12–I(k) statements,[31] could defeat summary judgment for the Vivados.

■■■ Alternatively, the Bank–Fund contends that even if the Vivados' living arrangement did not change the residential status of the mortgage, summary judgment was improper because the bank was not required to allow appellees to reinstate as of September 5, 1990. This argument fails for two reasons. First, it is based on the Bank–Fund's contention that the Vivados lacked the necessary funds to reinstate as of September 5, 1990, or at any time before the bidding began. In so arguing, the Bank–Fund fails to accord appropriate significance to the fact that the Vivados were unaware of their right to cure, as opposed to believing that the only way to save their home was to pay the full amount of the mortgage. The prospect of raising money to cure a default— in May 1990 the cure amount was $46,397.73 plus expenses—is substantially different from raising money to pay off the full amount of the debt—by October 2, 1990, the loan

---

**29.** *See District of Columbia Practice Manual,* ch. 22, part IX, at 22–38 (2d ed. 1989) ("pursuant to D.C.Code § 45–715.1, the right to reinstate, which is provided therein, only attaches to residential owner-occupants and not to investors").

**30.** In reviewing the grant of a defendant's motion for summary judgment the court must determine whether the trial judge properly concluded that the plaintiff failed to meet its burden of setting forth specific facts demonstrating genuine issues for trial. *Hill v. District of Columbia,* 345 A.2d 867, 869 (D.C.1975); *Brown v. General Motors Acceptance Corp.,* 490 A.2d 1125, 1126 (D.C. 1985); *Holland v. Hannan, supra,* 456 A.2d at 814.

**31.** We address the Bank–Fund's contention although it failed to provide appropriate support for its claim that a material dispute existed about who was residing at the Embassy Drive property. Rather than supporting its assertions with record references or affidavits, the Bank–Fund merely stated in its motion "on information and belief" that appellees were renting their home and were "at all times relevant to the proceedings" residing in Bolivia. *See Williams v. Gerstenfeld,* 514 A.2d 1172, 1176 (D.C.1986) ("[t]he failure of a party opposing summary judgment to provide supported contentions of a factual dispute will result in the court's acceptance of a movant's statement of facts as undisputed absent clear support for any such contention from the record") (citations omitted); *Spellman v. American Sec. Bank, supra,* 504 A.2d at 1125 n. 3; Super.Ct.Civ.R. 56(e); Super.Ct.Civ.R. 12–I(k).

amount due was $98,753.80. The sum was more than double the amount, and in many cases it could be greater.

Second, the statute affords the Vivados at least a full twenty-five day period after the notice of foreclosure (if not thirty days) as well as up until five days before the commencement of bidding, to raise the money to cure. D.C.Code § 45–715.1(b); *see supra* note 19. The Vivados correctly point out that whether they had the funds to cure on September 5, 1990, was not the issue. Clearly, they did not have notice for twenty-five days after August 6, 1990, that they had the right to cure. In fact, the notice told them the exact opposite, namely, that the amount to cure was irrelevant since theirs was not a residential mortgage. In this sense, the instant case is similar to *Independence Fed. Sav. Bank v. Huntley, supra,* 573 A.2d 787, where the homeowner was not given a full thirty days' notice of the intended foreclosure. The court, citing due process considerations, held that the foreclosure notice was deficient even though the homeowner learned of the foreclosure sale sixteen days before it occurred and was present at the sale. *Id.* at 788 ("[t]he purpose of the 30–day notice provision is to allow the owner substantially more time than plaintiff received to 'cure his default' in regard to the property"). Even if the bidding in the instant case was to begin on September 5, 1990, and thereby the Vivados did not have five days in addition to the thirty days to raise the cure amount, the record does not permit the court to conclude that they would have been unable to raise the needed funds had they been fully advised of their rights in a timely manner and not confronted with the Bank–Fund's foreclosure notice stating that they did not have a right to cure. Similarly, the court cannot conclude that had the Bank–Fund been aware that the Vivados had a right to reinstate as of September 5, 1990, the Bank–Fund's position regarding the conditions under which it would agree to a further postponement of the foreclosure sale would have remained the same as is reflected in the September 5, 1990, agreement; indeed, the record suggests the contrary. *See supra* notes 8 & 11. In other words, had the Bank–Fund not misinformed the Vivados of their statutory rights in the notice of foreclosure, they might have found the necessary resources in time.

Finally, the Bank–Fund's reliance on the Vivados' failure to meet the terms of the September 5, 1990, agreement is misplaced. While the record makes clear that the Bank–Fund has made efforts to assist the Vivados in avoiding foreclosure, this assistance does not allow the Bank–Fund to deprive the Vivados of their statutory remedy of reinstatement. Even if, as the Bank–Fund maintains and the trial judge found, the Vivados were aware of the amount needed to cure their defaults, the September 5, 1990, agreement was premised on the assumption that the Bank–Fund had complied with the statutory notice provisions and the Bank–Fund's assertion, in the written notice of foreclosure, that the Vivados no longer were entitled to reinstate the loan. The inducement for the Vivados to agree to pay the entire amount of the outstanding loan—almost $100,000—within thirty days in order to avoid the loss of their home was based on the erroneous assertion by the Bank–Fund that a less drastic and financially less burdensome remedy was no longer available to them. Since the premise underlying the inducement to enter the agreement was false, the agreement itself fails and is unenforceable. *See Hollywood Credit Clothing Co. v. Gibson,* 188 A.2d 348, 349 (D.C.1963) (mutual assent is essential element of a contract: "a contract in form may be avoided by a showing that assent was obtained by fraud or even misrepresentation falling short of fraud"). The fact that the Vivados were represented at some points by counsel does not cure the defect: as the Bank–Fund acknowledged during oral argument, the only way the Vivados could get the Bank–Fund to change its position was to seek injunctive relief in court. *See Independence Fed. Sav. Bank v. Huntley, supra,* 573 A.2d at 788 (filing of suit by homeowners did not prevent sale of property from going forward).

Accordingly, we affirm the grant of summary judgment to the Vivados.

## III.

*Appeal No. 92–CV–282:* The Vivados contend that the motions judge abused

her discretion by requiring that the Vivados secure the preliminary injunction enjoining the scheduled December 27, 1991, foreclosure sale by paying an amount equal to their monthly mortgage obligations on the first and second trusts into an interest bearing escrow account and maintaining hazard insurance on the property. They maintain, principally, that the motions judge failed to take into account the conceded fact that the first deed of trust had been paid and released and, therefore, could not be used to inflate the cure figure in the foreclosure notice.[32] In view of our conclusions in Part II (that a valid foreclosure notice must include the cure figure, that the August 1990 foreclosure notice was deficient, and that the September 1990 foreclosure sale was therefore invalid), the issue raised with regard to the November 25, 1991, foreclosure notice turns on whether the cure figure must be accurate.

Under § 45–715.1, a residential mortgage debtor has the right to cure a default by paying "all sums, including any reasonable late penalty, required to bring the account *current, with the exception* of any amounts due by operation of any acceleration clause that may be in the security agreement...." D.C.Code § 45–715.1(c)(1) (emphasis added). Given the fact that the cure statute was designed to prevent lenders from putting borrowers in the position of having to make payment of the note in full or forfeit their homes, *see supra* Part II, § 45–715.1 achieves this goal by requiring only that the borrower bring the account *current* in order to cure the default. Necessarily, in order to fulfill the statutory purpose, the cure amount must be accurately stated. From an examination of the Bank–Fund's notice forms, we conclude that the Bank–Fund may have erred in its calculation of the cure figure by erroneously including in its funds advanced with respect to the first trust that were not secured by the property at issue.

In the initial May 4, 1990, notice of foreclosure, the Bank–Fund identified the balance of the note as $33,753.85 plus interest, advances, and expenses. The cure figure

was stated to be $46,397.73, plus expenses, an amount higher than the balance of the note. From the record it appears that the Bank–Fund, having unilaterally decided to advance funds to the first note holder (Washington Federal) in order to keep the first trust current in order to protect the Bank–Funds' interest in the property, included the advances in its calculation of the cure figure. Similarly, with respect to the November 25, 1991, notice, which forms the basis of the second appeal, the Bank–Fund stated that the balance of the note was $230,358.29, plus interest and expenses, and that the minimum balance to cure was $214,550.58 plus interest and expenses. The record suggests that the Bank–Fund was again tacking on debt associated with the first trust.

The problem in the second appeal arises from the fact that the Bank–Fund bought or paid off the first trust between the time of the foreclosure sale and the invalidation of that sale by the trial judge. The record is unclear as to whether the Bank–Fund bought the first note outright, distributed the funds pursuant to Washington Federal's due-on-sale clause, or simply paid the note off because the Bank–Fund believed at that time that it was the owner of the property. At the argument on the preliminary injunction, when counsel for the Bank–Fund advised the motions judge that the Bank–Fund had, when it thought it was the owner, paid off the first note, which was then released, the motions judge stated that the foreclosure could, accordingly, only be on the amount of the second trust. The Bank–Fund, while purporting not to dispute the motions judge's statement, nevertheless asserted that it did not agree that the first trust was no longer a lien on the property. When the motions judge responded that the first trust was gone unless the grant of summary judgment to the Vivados was reversed, the Bank–Fund protested that it would argue otherwise. Although the motions judge sought to be informed of the basis for the Bank–Fund's position, the subject was never resolved because the argument moved onto other issues, with the Bank–Fund ultimately stating that

---

**32.** We need not reach the Vivados' other contentions with regard to insufficient time for a valid foreclosure to occur under the November 25, 1991, foreclosure notice, and asserted equities that the Vivados claimed weighed in their favor.

it would agree to issuance of an injunction subject to being secured by monthly payments. Thus, it is difficult to determine from the record what were the consequences of the Bank–Fund's settling of the first trust. According to the Vivados, the Bank–Fund *paid off* Washington Federal's delinquent first trust when the latter invoked its rights under the due on sale clause provision of the first trust.[33] According to the Bank–Fund, from February of 1989 through November of 1990, it had, "out of its own pocket," advanced more than $33,000 to keep the first trust current until it ultimately "satisfied the entire indebtedness."

When the trial judge invalidated the September 1990 sale, *see supra* note 16, the Bank–Fund realized that it would have to reinstitute foreclosure proceedings in its capacity as a mortgagee because it was not the owner of the property. *See supra* Part II. The question is whether the Bank–Fund could only foreclose as to its second trust or could also include as secured debt the amount that it supplied to pay off the first trust. Although recognizing that it ought to insert a cure figure in view of the trial judge's grant of summary judgment to the Vivados, the Bank–Fund maintains that because it paid off the first trust, it could foreclose on the basis of what it paid the first trust holder as well as any default under the second trust. But, because the status of the funds advanced by the Bank–Fund on behalf of the Vivados to Washington Federal is unclear from the record—i.e., whether secured or unsecured—it is also unclear that the Bank–Fund could properly include mo-

nies due under the cancelled first trust in arriving at a cure figure.

If the Bank–Fund simply paid off the first note, as distinct from purchasing the first note, then in calculating the sum necessary to bring an account current, it appears that the Bank–Fund considered an improper factor—funds pertaining to the first trust—and thus improperly inflated the cure figure. Section 45–715.1 was enacted to prevent lenders from putting residential mortgagors behind the proverbial eight ball. Yet this is what the Bank–Fund has done by calculating the cure figure to be tantamount to or greater than the balance of the note. However, given the state of the record and the procedural posture of the second appeal (from the grant of a preliminary injunction), we conclude that a remand is required to afford the Bank–Fund an opportunity to demonstrate that it was entitled to consider the amounts advanced to cover the first trust to be advances secured by the property such that it was proper to factor those amounts into the calculation of the cure figure.[34] Absent a showing that the additional funds advanced by the Bank–Fund to keep the first trust current and ultimately advanced to pay-off the first note are secured by property, the Bank–Fund could not include monies due under the cancelled first trust in arriving at a cure figure.

Regardless of the Bank–Fund's status as to the Vivados with regard to the first trust, however, the November 25, 1991, notice appears to contain an incorrect cure figure. If the Bank–Fund simply paid off the first note, then the November 25, 1991, notice appears

---

**33.** The Vivados' characterization of the Bank–Fund's actions has not been entirely consistent. Although they refer in their pleadings to the Bank–Fund's paying off of the first note, on other occasions they refer to the first loan as having been bought or acquired.

**34.** This could be done, for instance, by demonstrating that the land records indicate that there is an encumbrance on the property held by the Bank–Fund which secures more than the $33,-000 of the second trust. According to the Vivados' complaint for injunctive and other relief:

The first trust note was marked "paid and cancelled," and, on information and belief, the first deed trust was released in the D.C. land records by instrument recorded on Roll Frame 574–896 in the Office of the Recorder of

Deeds. Any obligation thereunder is no longer secured and enforceable by foreclosure.

Alternatively, the Bank–Fund might be able to show another basis which converted its payment of the first note into additional secured debt. For instance, the note for the second trust provides that "[i]f the Note Holder has required [the borrower] to pay immediately in full as described above, the Note Holder will have the right to be paid back by [the borrower] for all its reasonable costs and expenses to the extent not prohibited by applicable law." On remand the trial court will have to determine whether these amounts owed to the Bank–Fund were to be considered as secured by the property as well so they could be added to the calculation of a right-to-cure figure.

to be invalid because it stated that the amount required to effect a cure was $214,-550.58, reflecting, apparently, that the Bank–Fund was acting as if it had purchased the first trust and, therefore, could demand that the Vivados fulfill their obligations under both trusts in order to cure their default. Alternatively, if the Bank–Fund could look to the Vivados to fulfill their obligations under the first trust note that the Bank–Fund purchased and paid off, the $214,550.58 cure figure would be incorrect because § 45–715.1 provides that the amount to cure is only the amount "required to bring the account current."

■ Obviously, the danger in this type of situation is that the Bank–Fund could inflate the cure figure and, thereby, make it more difficult for the Vivados, by including in its calculation of the cure figure funds that were not secured by the property. Such a practice of "tacking on" unsecured debt does not comport with language or the purposes of the statute. *See supra* Part II. From our holding in the first appeal that the foreclosure notice must include the right-to-cure amount, it follows, in order to fulfill the statutory purposes, that the cure figure can only encompass debt that is secured by the property. On remand, therefore, the Bank–Fund must demonstrate that it was entitled to include funds advanced on the first trust when calculating the cure figure.

Accordingly, we affirm the grant of summary judgment to the Vivados in Appeal No. 91–CV–1325, and we remand the case in Appeal No. 92–CV–282 for a determination of whether the funds provided by the Bank–Fund in paying the first note were secured or unsecured funds. Upon remand, if the trial court finds that the funds were secured, then the injunction, as secured, is affirmed, and, alternatively, if the trial court finds that the funds provided to pay the first note were not secured by the property, then the injunction shall be vacated; in either event, the trial court shall make findings sufficient to permit appellate review.